GEORGIA POWER COMPANY,
Plaintiff-Appellee,

v.

54.20 ACRES OF LAND, situated lying and being LAND LOTS 315 AND 326 OF the 3RD LAND DISTRICT, etc., et al., Defendants,

Jim Dodson and Patricia W. Womack, Defendants-Appellants.

J. C. HILSMAN et al., Plaintiffs-Appellants,

v.

GEORGIA POWER COMPANY, Defendant-Appellee.

Nos. 75–4448 and 77–1327.

United States Court of Appeals, Fifth Circuit.

Nov. 28, 1977.

---

Denmark Groover, Jr., Macon, Ga., for defendants-appellants in 75–4448.

George D. Lawrence, Eatonton, Ga., Warren C. Fortson, Atlanta, Ga., amicus curiae, for defendants-appellants in 75–4448.

Wallace Miller, Jr., W. Warren Plowden, Jr., Macon, Ga., amicus curiae, for plaintiff-appellee in 75–4448.

Allan Abbot Tuttle, Sol., Federal Power Commission, Allan M. Garten, Washington, D. C., amicus curiae, for plaintiff-appellee in 75–4448.

George D. Lawrence, Jr., Eatonton, Ga., for Hilsman, et al.

Charles H. Ivy, Atlanta, Ga., for Elliott, et al.

James H. Rollins, W. Dan Greer, Atlanta, Ga., for Boswell, et al.

Ronald Montalto, Atlanta, Ga., Howard T. Oliver, Jr., Gainesville, Ga., for Askew.

Before WISDOM, SIMPSON, and TJOFLAT, Circuit Judges.

WISDOM, Circuit Judge:

These condemnation cases present the issue whether compensation should be determined under federal law or under the law of the state where the condemned property is located when a licensee of the Federal Power Commission exercises the power of eminent domain in federal court as authorized by Section 21 of the Federal Power Act, 16 U.S.C. § 814 (1970). We reserved this question in *Louisiana v. Lindsey,* 5 Cir. 1975, 524 F.2d 934, as did the Supreme Court in *Grand River Dam Authority v. Grand-Hydro, Inc.,* 1948, 335 U.S. 359, 69 S.Ct. 114, 93 L.Ed. 64. We now hold that federal law controls.

I.

The plaintiff-appellee, Georgia Power Company, is a privately owned Georgia utility. It intends to operate a hydroelectric power generating facility with a dam across the Oconee River in Hancock and Putnam Counties, Georgia, at a point known as Laurens Shoals. The dam will produce a lake to be known as Lake Wallace. The appellants are Georgia landowners with property which will be inundated by Lake Wallace.[1]

---

1. The numerous appellants in this consolidated appeal fell into three groups for briefing purposes. In addition, Mrs. Nellie W. Larman, another landowner involved in a Lake Wallace condemnation proceeding, filed an amicus brief. Because each appellant's argument, if successful, would benefit the appellants as a group, we generally have not identified the

Under the Federal Power Act, 16 U.S.C. §§ 791a, et seq. (1970), the Federal Power Commission may issue licenses to certain persons or entities to construct, operate, or maintain various hydroelectric generating facilities. 16 U.S.C. § 797(e). The F.P.C. issued a license to Georgia Power on August 6, 1969, for the Lake Wallace Project.[2] As a licensee, Georgia Power may exercise the right of eminent domain under Section 21 of the Federal Power Act, 16 U.S.C. § 814 (1970), which provides:

> When any licensee cannot acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto . . . it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such land or other property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided,* That United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

Exercising this right, Georgia Power brought actions in the District Court for the Middle District of Georgia. Senior Judge W. A. Bootle appointed a three-member Commission, *see* Fed.R.Civ.Proc. 71A, to de-

termine the amount of compensation due the condemnees. In his instructions to the Commissioners, Judge Bootle set out the federal law of compensation. These rules differ from Georgia law. Instruction No. 20 directs the Commissioners to ignore an increase in value which the Georgia Power project has created in the condemned property; a Georgia court might recognize such value. *See Hard v. Housing Authority,* Ga. 1963, 219 Ga. 74, 132 S.E.2d 25. Instruction No. 21 allows the Commissioners to offset any recovery for land actually taken with benefits to any remaining property caused by the project; Georgia law prohibits such a set-off. *See* Ga.Code Ann. § 36–504 (1970). The district court declined to instruct the Commissioners to include a reasonable attorneys' fee in their award; in a Georgia proceeding a reasonable attorneys' fee would be allowed. *See White v. Georgia Power Company,* Ga.1976, 237 Ga. 341, 227 S.E.2d 385.

After these instructions were first made in 1975 several condemnees in cases other than No. 75–4448 filed motions and objections opposing the use of federal law. The district court held a pre-trial hearing on the objections. Judge Bootle made several changes in the phrasing of his instructions, but he regarded federal law as controlling.[3] The Commission then heard evidence in No. 75–4448. Its report concluded that the benefits accruing to the land remaining with the landowners exceeded the value of the property taken. As a result, the Commission awarded no monetary compensation. The landowners opposed Georgia Power's motion to confirm the report on the ground that the offset of benefits was improper.

---

particular party advancing an argument discussed in this opinion.

2. 42 F.P.C. 356 (1969). At that time, the project was known as the Laurens Shoals Project and the license is issued in that name.

3. After the hearing, Judge Bootle provided a Memorandum to Counsel citing cases supporting his conclusion that federal law of compensation applies. Those cases are *Clearfield Trust Co. v. United States,* 1943, 318 U.S. 363,

63 S.Ct. 573, 87 L.Ed. 838; *United States v. County of Allegheny,* 1944, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209; *United States v. Standard Oil Co.,* 1947, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067; *United States v. Yazell,* 1966, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404; *Duvall-Wheeler Livestock v. United States,* 5 Cir. 1969, 415 F.2d 226; *United States v. McCleskey Mills, Inc.,* 5 Cir. 1969, 409 F.2d 1216.

The court overruled these objections and the condemnees appealed.[4]

No. 77–1327 began after Judge Bootle's decision in No. 75–4448 to apply federal law. The condemnees in No. 77–1327 nevertheless moved that the court incorporate Georgia law into its instructions.[5] The judge conducted a pre-trial conference and heard argument on the question. He then denied the motion and adhered to his previous order that federal law applies. Judge Bootle certified the question for immediate review under 28 U.S.C. § 1292(b) (1970). This Court allowed the appeal, and consolidated it with No. 75–4448.

## II.

Before a federal court may reach the question of applying state or federal common law to an issue before it, the court must determine that the source of the right or authority in question is federal. If the source is not federal, *Erie Railroad Co. v. Tompkins,* 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, and the Rules of Decision Act[6] direct that state law apply of its own force. Even if the source is federal, the court must follow any congressional directions about the proper law to apply. *See* Comment, *Adopting State Law as the Federal Rule of Decision: A Proposed Test,* 43 U.Chi.L.Rev. 823, 826 (1976).

We find that the source of the power to condemn property contained in Section 21 is federal. Eminent domain inheres in sovereignty. *See Kohl v. United States,* 1876, 91 U.S. 367, 23 L.Ed. 449. Within our federal system the states and the federal government exercise independent powers of eminent domain, and neither can delegate the use of the other's authority. 91 U.S. at 372–73, 23 L.Ed. 449; *Latinette v. City of St. Louis,* 7 Cir. 1912, 201 F. 676, 678. Thus,

when Congress provided that licensees could exercise "the" power of eminent domain, it was referring to the federal power. Both courts and commentators have described the eminent domain power delegated in Section 21 as the federal power. *Federal Power Commission v. Tuscarora Indian Nation,* 1960, 362 U.S. 99, 120, 80 S.Ct. 543, 4 L.Ed.2d 584; *City of Tacoma v. Taxpayers of Tacoma,* 1958, 357 U.S. 320, 340, 78 S.Ct. 1209, 2 L.Ed.2d 1345; *Chapman v. Public Utility District No. 1,* 9 Cir. 1966, 367 F.2d 163, 167; 7 *Moore's Federal Practice* ¶ 71A.10[2]. When it condemns land under Section 21, a licensee acts as the agent of the United States government. *Tuscarora Nation of Indians v. Power Authority,* 2 Cir. 1958, 257 F.2d 885, 894, *vacated as moot sub nom, McMorran v. Tuscarora Nation of Indians,* 362 U.S. 608, 80 S.Ct. 960, 4 L.Ed.2d 1009. This delegation of federal power is constitutional. *Missouri v. Union Electric Light & Power Co.,* C.D.Mo.1930, 42 F.2d 692; *see Thatcher v. Tennessee Gas Transmission Co.,* 5 Cir. 1950, 180 F.2d 644, *cert. denied,* 340 U.S. 829, 71 S.Ct. 66, 95 L.Ed. 609 (upholding identical delegation in the Natural Gas Act, 15 U.S.C. § 717(b) (1970)).

Appellants argue that Section 21 does not delegate federal authority, but merely provides a federal forum for exercise of a state created eminent domain power. Such an interpretation does not accord with decisions upholding the right of a licensee to condemn property that it could not obtain under the applicable state statute. *E. g., City of Tacoma v. Taxpayers of Tacoma,* 1958, 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345; *First Iowa Hydro-Electric Cooperative v. Federal Power Commission,* 1946, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143.

---

**4.** During the condemnation proceedings of 75–4448 the appellant Jim Dodson conveyed his interest in the condemned property to Patricia Womack. On March 21, 1975 Judge Bootle granted Georgia Power's motion to add Patricia Womack as a defendant.

**5.** The composition of the Commission and the Instructions given to the Commissioners are the same in both cases before us.

**6.** The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as the rules of decision in civil actions in the courts of the United States, in cases where they apply.

28 U.S.C. § 1652 (1970).

There is no suggestion in the statute that Congress intended to create an interstitial power of eminent domain that would function only when state powers were inadequate. In contrast, Section 19, 16 U.S.C. § 812 (1970) expressly limits the FPC's authority to regulate rates to situations where a state does not have its own regulations. Section 20, 16 U.S.C. § 813 (1970) places similar limits on other powers of regulation.

We are not persuaded by the argument that the $3,000 in controversy requirement shows that Section 21 is a jurisdictional provision. It is true that this requirement parallels the amount in controversy requirement for diversity cases at the time the Federal Power Act was enacted. Congress, however, added the $3,000 requirement late in the consideration of the Federal Power Act. *Compare* H.R.Rep.No.715, 65th Cong., 2d Sess. 27, H.R.Rep.No.1147, 65th Cong., 3d Sess. 13, *and* H.R.Rep.No.61, 66th Cong., 1st Sess. 10 (original versions without the $3,000 amount in controversy requirement) *with* S.Rep.No.180, 66th Cong., 1st Sess. 9 and 16 U.S.C. § 814 (1970) (versions containing $3,000 amount in controversy requirement as added on the House floor). As a result, the requirement cannot be read as an indication of the original purpose of Section 21. Members of Congress do not seem to have believed the amount in controversy amendment significantly changed Section 21; the Senate and Conference Committee Reports, written after the House adoption of the amendment, do not mention it. Furthermore, the House debates establish that the amount in controversy minimum was designed to prevent inconvenience to a landowner who might otherwise need to travel several hundred miles to press a small compensation claim. 58 Cong.Rec. 2240 (1919) (remarks of Mr. Stevenson).

We have not found any congressional directive to apply state law in either the language of Section 21 or its legislative history. Therefore, the second prerequisite to our consideration of the choice of law issue is met. The language in the statute referring to state "practice and procedure" does not govern the choice between substantive rules of compensation. The Supreme Court has held that such language "[does] not, and could not, affect questions of substantive right—such as the measure of compensation—grounded upon the Constitution of the United States". *United States v. Miller*, 1943, 317 U.S. 369, 380, 63 S.Ct. 276, 283, 87 L.Ed. 336. *Accord United States v. 93.970 Acres of Land*, 1959, 360 U.S. 328, 79 S.Ct. 1193, 3 L.Ed.2d 1275. The appellants attempt to distinguish *Miller* on the ground that the plaintiff was the United States rather than a private licensee. We cannot see why in this context the identity of the plaintiff would change the meaning of virtually identical language.[7]

---

7. The *Miller* opinion specifically interpreted the following statutes:

   In every case in which the Secretary of the Treasury or any other officer of the Government has been, or hereafter shall be, authorized to procure real estate for the erection of a public building or for other public uses, he may acquire the same for the United States by condemnation, under judicial process, whenever in his opinion it is necessary or advantageous to the Government to do so, and the Attorney General of the United States, upon every application of the Secretary of the Treasury, under this section and section 258 of this title, or such other officer, shall cause proceedings to be commenced for condemnation within thirty days from receipt of the application at the Department of Justice.
   40 U.S.C.A. § 257.

   The practice, pleadings, forms and modes of proceeding in causes arising under the provisions of this act shall conform, as near as may be, to the practice, pleadings, forms and proceedings existing at the time in like causes in the courts of record of the State within which such [district court is] held, any rule of the court to the contrary notwithstanding.
   Act of Aug. 1, 1888, c. 728 § 2, 25 Stat. 357. This section was codified, as amended, at 40 U.S.C. § 258 until it was superceded by Rule 71A of the Federal Rules of Civil Procedure.

   The Secretary of the Army may cause proceedings to be instituted, in the name of the United States in any court having jurisdiction of such proceedings, for the acquirement by condemnation of any land, right of way or material needed to enable him to maintain, operate or prosecute works for the improvement of rivers and harbors for which provision has been made by law; such proceedings to be prosecuted in accordance with the

And insofar as Section 21 did require conformity with state practice, it has been superseded by Rule 71A of the Federal Rules of Civil Procedure. *United States v. 93.970 Acres of Land,* 1959, 360 U.S. 328, 79 S.Ct. 1193, 3 L.Ed.2d 1275; 7 *Moore's Federal Practice* ¶ 71A.10[2] at 71A–252 (2d ed. 1975).

There is little discussion of Section 21 in the Committee Reports or the congressional debates, and none of it illuminates the choice of law issue. Appellants argue, however, that other sections of the statute, such as Sections 19 and 20, evidence a congressional respect for state law which includes state rules of compensation in an eminent domain proceeding. We are not ready to make this inference from unrelated provisions in the Federal Power Act without more support in the legislative materials. The legislative history reveals that Congress took care to preserve state rights in the regulation of power and property to forestall a constitutional attack on the Federal Power Act. *See, e. g., First Iowa Hydro-Electric Cooperative v. Federal Power Commission,* 328 U.S. at 174, 66 S.Ct. 906. As a result, the Federal Power Act contains many explicit acknowledgements of state authority. *See, e. g., Id.* at 174 n. 19, 66 S.Ct. 906; Sections 4(a) and (c) [8] (requires cooperation between the FPC and the executive departments and other agencies of the state and federal governments on specified subject); 4(f) [9] (requires notice of application for a preliminary permit to be given to any state or municipality likely to be interested); 7(a) [10] (gives preference in issuing permits and licenses to states and municipalities); 10(e) [11] (provides that certain licenses to states and municipalities be issued and enjoyed without charge); 14 [12] (gives states or municipalities as well as federal government an option to acquire a licensed project); 19; [13] 20; [14] and 27 [15] (a "saving" clause concerning state laws relating to the control, appropriation, use or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein). The failure to mention specifically state laws of eminent domain contrasts with these provisions, and suggests, if anything, that Congress did not believe it necessary to follow state eminent domain rules or desire courts to do so.[16]

laws relating to suits for the condemnation of property of the States wherein the proceedings may be instituted: *Provided, however,* That when the owner of such land, right of way, or material shall fix a price for the same, which in the opinion of the Secretary of the Army, shall be reasonable, he may purchase the same at such price without further delay: *And provided further,* That the Secretary of the Army is authorized to accept donations of land or materials required for the maintenance or prosecution of such works.
33 U.S.C.A. § 591.

**8.** 16 U.S.C. § 797(a) and (c) (1970).

**9.** 16 U.S.C. § 797(f) (1970).

**10.** 16 U.S.C. § 800(a) (1970).

**11.** 16 U.S.C. § 803(e) (1970).

**12.** 16 U.S.C. § 807 (1970).

**13.** 16 U.S.C. § 812 (1970).

**14.** 16 U.S.C. § 813 (1970).

**15.** 16 U.S.C. § 821 (1970).

**16.** The dissent makes much of the fact that Congress did not assure "application of a uniform, federal standard in any exercise of eminent domain power, *state* or federal, to acquire land on which to build these federally regulated facilities". (Emphasis changed.) This omission becomes much less telling when one realizes that it is not certain that Congress had the power to compel such uniformity.

Congress could not have simply passed a statute instructing the states to apply federal rules of compensation whenever a licensee chose to exercise a state-granted power of eminent domain to take property for a licensed project. As Justice Brandeis stated in *Erie*: "Congress has no power to declare substantive rules of common law applicable in a state whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts". 304 U.S. at 78, 58 S.Ct. at 822.

Nor could Congress have passed a law forbidding a state from delegating state eminent domain power to a federal licensee. A state has exclusive control over its power of eminent domain. *Kohl v. United States,* 91 U.S. at 372–73, 23 L.Ed. 449. Just as the federal government could not force the states to grant licensees the use of state eminent domain power, it could not force them not to make the grant.

The Committee Reports reveal that some members had concerns over the constitutionality of Section 21, although it is not clear whether they thought it an improper invasion of state prerogatives or an improper delegation of federal authority to private parties. H.R.Rep.No.61, 66th Cong., 1st Sess. 10. At any rate, a majority expressed belief that the provision was constitutional and appropriate, without any indication that such a conclusion would be possible only if federal courts applied state law in Section 21 cases. *Id.*[17]

The appellants also argue that Congress endorsed the use of state compensation law when it enacted a provision substantially identical to Section 21 in the Natural Gas Act, 15 U.S.C. § 717f(h) (1970), without commenting adversely on certain cases appellants read to mandate adoption of state law for all substantive issues arising in a Section 21 lawsuit. In a similar vein, the appellants urge us to follow these decisions as a matter of stare decisis. In particular, they draw our attention to a line of Eighth Circuit cases beginning with *Feltz v. Central Nebraska Public Power and Irrigation District*, 8 Cir. 1942, 124 F.2d 578[18] and to *Oakland Club v. South Carolina Public Service Authority*, 1940, E.D.S.C., 30 F.Supp. 334, *aff'd*, 4 Cir. 1940, 110 F.2d 84.

We do not read these cases as determinative of the issue before us. In *Feltz*, a FPC licensee condemned land for relocation of a highway. The landowner claimed consequential losses because the property was divided and because of increased distance to the railhead. The jury gave a smaller award than the appraisers, and the court added interest from the date of the taking. Both sides appealed. Among other questions, the court of appeals ruled on the exclusion of evidence of consequential damages, 124 F.2d at 578, and the propriety of interest on a compensation award, 124 F.2d at 584. Without articulating its reasoning, the court indicated that Nebraska law controlled both issues. There is no indication that the parties contested this issue or that the court gave it any serious consideration. Indeed, because of the mixture of issues each party may have thought it to his advantage to rely upon state law. The condemnees had read that state law to allow consequential damages and the condemnor could cite favorable state law on interest. The specific issue of just compensation raised before this Court was not considered. The other Eighth Circuit cases also lack any discussion of a general choice of law problem or of the specific issue before us. In the absence of any reasoned discussion of the difficult choice of law issue, we cannot accept these cases as persuasive authority or interpret congressional inattention to them as an endorsement of the view that state law should fill all substantive gaps in Section 21.

*Oakland Club* is not on point. In that case the federal licensee enjoyed state as well as federal power of eminent domain. It filed a condemnation in federal court which the property owner contested on the grounds that the South Carolina procedure was constitutionally defective and that Section 21 authorized the licensee to take only an easement rather than a fee.

The district court upheld the state procedure and interpreted Section 21 to authorize the taking of a fee interest. It went on to make several observations that the appellants have emphasized in this case. First, the court stated that Section 21 is not a "comprehensive, self-contained and exclusive law of eminent domain". Second, the

---

**17.** We note that Congress passed the Federal Power Act in 1920, during the era of *Swift v. Tyson*, 1842, 41 U.S. 1, 10 L.Ed. 865. Thus, Congress would have expected federal courts to apply general common law absent a specific congressional direction to the contrary.

**18.** The other Eighth Circuit cases are *Central Nebraska Public Power & Irrigation Dist. v. Harrison*, 8 Cir. 1942, 127 F.2d 588, *Central Nebraska Public Power & Irrigation Dist. v.*

*Fairchild*, 8 Cir. 1942, 126 F.2d 302; *Samuelson v. Central Nebraska Public Power & Irrigation Dist.*, 8 Cir. 1942, 125 F.2d 838; *Burnett v. Central Nebraska Public Power & Irrigation Dist.*, 8 Cir. 1942, 125 F.2d 836; *McGinley v. Central Nebraska Public Power & Irrigation Dist.*, 8 Cir. 1942, 124 F.2d 692; and *Central Nebraska Public Power & Irrigation Dist. v. Berry*, 8 Cir. 1942, 124 F.2d 586.

court construed Section 21 "not as an exclusive law of eminent domain, . . . but as complementary to the State law, and as enabling the holder of a Federal Power license to exercise in the Federal courts . . . the substantive rights of eminent domain granted to it under the State law." 30 F.Supp. at 341. The Court of Appeals approved of these statements and added its own suggestion that Section 21 was meant to give a condemnor "the privileges of eminent domain under the State law . . ." 110 F.2d 84, 86.

Insofar as the *Oakland Club* litigation stands for the point that Section 21 does not preempt any applicable state powers of eminent domain, it is irrelevant to the issue before us.[19] Insofar as the case supports the argument that Section 21 is solely a jurisdictional provision, we reject it for the reasons already expressed. And insofar as it interprets Section 21 to grant a state rather than a federal power of eminent domain, we find it in conflict with holdings by the Supreme Court. *See Federal Power Commission v. Tuscarora Indian Nation,* 1960, 362 U.S. 99, 120, 80 S.Ct. 543, 4 L.Ed.2d 584; *City of Tacoma v. Taxpayers of Tacoma,* 1958, 357 U.S. 320, 340, 78 S.Ct. 1209, 2 L.Ed.2d 1345; *see also Kohl v. United States,* 1876, 91 U.S. 367, 372–73, 23 L.Ed. 449, 451 (federal government lacks the power to grant the use of a *state* power of eminent domain). Neither the district court nor the Court of Appeals in *Oakland*

*Club* considered the specific issue whether state or federal law governs the methodology of determining compensation under Section 21. In sum, the *Oakland Club* opinions are far too questionable and unclear to justify adherence by this Court or to warrant an interpretation of congressional failure to comment upon them as an expression of legislative intent on the choice of law issue before us.[20]

### III.

We now proceed to the principal issue. Because the source of the power delegated by the Federal Power Act is federal, the governing law must be federal. *See, e. g.,* Friendly, *In Praise of Erie—And of the New Federal Common Law,* 39 N.Y.U.L. Rev. 383, 407 (1964); Mishkin, *The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision,* 105 U.Pa.L.Rev. 797, 798–801 (1957); Comment, *Adopting State Law as the Federal Rule of Decision: A Proposed Test,* 43 U.Chi.L.Rev. 823, 826–27 (1976). Of course, federal law may be fashioned by adopting parallel state rules. *E. g., Clearfield Trust Co. v. United States,* 1943, 318 U.S. 363, 367, 63 S.Ct. 573, 87 L.Ed. 838. For instance, the courts usually determine what constitutes "property" by looking to state law. *E. g., United States v. Certain Property Located In Borough of Manhattan,* 2 Cir. 1965, 344 F.2d 142, 144–

---

**19.** This Circuit has held that § 7(h) of the Natural Gas Act, 15 U.S.C.A. § 717f(h), which is almost identical to § 21 of the Federal Power Act, does not preempt state laws of eminent domain. *Robinson v. Transcontinental Gas Pipe Line Corp.,* 5 Cir. 1970, 421 F.2d 1397, *cert. denied,* 398 U.S. 905, 90 S.Ct. 1695, 26 L.Ed.2d 64.

**20.** The other cases cited in various landowner briefs as expressing a direct or indirect conclusion that state law of compensation applies in a Section 21 condemnation are also off the mark. *King v. Grand River Dam Auth.,* 10 Cir. 1964, 336 F.2d 682, expressly refuses to reach the issue. *Id.* at 683. In *Tennessee Gas Transmission Co. v. Thatcher,* 1949 W.D.La., 84 F.Supp. 344, *aff'd sub nom Thatcher v. Tenn. Gas Transmission Co.* 5 Cir. 1950, 180 F.2d 644, *cert. denied,* 340 U.S. 829, 71 S.Ct. 66, 95 L.Ed. 609, a landowner challenged § 7(h) of the Natu-

ral Gas Act. Among his theories was one that the Act violates the fifth amendment because it makes no provision within itself for ascertaining and paying adequate compensation. The district court rejected this challenge, noting that "it has been uniformly held that state *procedure* may be used in condemnation cases under Federal Laws" and citing *Oakland Club. Id.* at 346 (emphasis added). The Court of Appeals did not discuss the question specifically. The trial judge's statement is ambiguous and may refer only to procedural matters that have been governed by Rule 71A since 1951. At any rate, the complete lack of reasoning to support the statement undercuts any comfort the opinion may give to the appellants here. All the other cases cited as precedent for appellants' position are also either off point or unpersuasive.

45 (Friendly, J.); *United States v. 145.30 Acres of Land*, 1974 D.La., 385 F.Supp. 699, aff'd, 5 Cir. 1975, 524 F.2d 1231.

Courts apply independent rules, however, when considering the specific issue of compensation in federal condemnations. *E. g., United States v. Miller*, 1943, 317 U.S. 369, 380, 63 S.Ct. 276, 87 L.Ed. 336; *United States v. Certain Property Located in Borough of Manhattan*, 2 Cir. 1965, 344 F.2d 142, 146; *United States v. City of New York*, 2 Cir. 1948, 165 F.2d 526, 528 (L. Hand, J.); *United States v. Certain Parcels of Land*, 3 Cir. 1944, 144 F.2d 626, 628; *United States v. 3,595.98 Acres of Land*, 1962 N.D.Cal., 212 F.Supp. 617; 12 Wright & Miller, *Federal Practice and Procedure: Civil* § 3042 (1973). These cases did not arise in the specific context of a federal condemnation by a Federal Power Act licensee pursuant to Section 21. Nevertheless, we should follow the same rule unless there are circumstances unique to a federal condemnation under Section 21 which require the opposite result.[21]

The appellants suggest that several such circumstances exist. First, they contend that we should distinguish between cases where the United States is a party and where it is not, applying federal rules of compensation only in the former situation. Since a licensee exercises the federal power of eminent domain, it is not immediately apparent why such a distinction should be made. That the property will be used privately is not reason enough. In *Miller*, for instance, the United States took land for use by a private railroad. Appellants, however, cite *Public Utility District No. 1 v. City of Seattle*, 9 Cir. 1967, 382 F.2d 666, 1969, cert. dismissed, 396 U.S. 803, 90 S.Ct. 22, 24 L.Ed.2d 59, and *Tacoma v. Taxpayers of Tacoma*, 1957, Wash., 307 P.2d 567, rev'd, 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345, to support a theory that the Federal Power Act delegates less than the full power of eminent domain. As a result, the appellants continue, a licensee should not benefit from the same legal rules as the United States.

In *City of Seattle* the Court considered whether a licensee must compensate the owner of shorelands and, for power site values, the owner of adjoining uplands, for property needed for a licensed hydroelectric project. The United States would not have paid any compensation if it had condemned the same property. Instead, it could have relied upon the dominant navigational ser- ·

---

**21.** Despite the dissent's implication to the contrary, we are well aware of Judge Friendly's distinction between the question whether an issue is a federal one so that federal courts may formulate a rule of decision and the question whether the rule formulated should follow state or uniform national law. Judge Simpson reads these cases to establish only the first step, that compensation in a federal condemnation is a federal question. But the cases take the second step. They chose to apply uniform nation-wide rules.

For instance, as the excerpt quoted by the dissent shows, dissenting opinion, at p. 1196 n. 6, the Supreme Court in *Miller* saw no need to determine local law of compensation. The reason was that the Court applied federal rules of decision. 317 U.S. at 373–79, 63 S.Ct. 276. The dissent singles out *United States v. Certain Property* as an example of a proper analysis of the choice of law issue. Dissenting opinion, at p. 1196 n. 7. The quoted segment suggests that Judge Friendly refused to rely on national law in federal condemnations. In fact, the quotation comes from a section of the opinion dealing only with the definition of "property", an issue not raised in this case. When Judge Friendly considered the much more relevant compensation question he acknowledged that compensation in federal condemnations is set by federal rules. He looked to state decisions only "in the absence of some authoritatively determined federal rule to the contrary" and only to the extent that the persuasiveness of state decisions justified including them into the national law. 344 F.2d at 147.

Nowhere do we suggest that the proper analysis for a choice of law question changes because the issue is one of just compensation in a federal condemnation. Nor do we consider ourselves blindly bound by past cases in the sense of reading them to mandate federal rules of compensation in every federal condemnation. We do find, however, that these cases are helpful starting points. Other courts in federal compensation cases have balanced the state and federal interests and have concluded that federal, rather than state, law should supply the rules of compensation. Unless we find the weights on our scale to be substantively different, we see no reason to diverge from the conclusion of the Supreme Court and some of our Courts of Appeals.

vitude for its power to utilize without compensation the stream bed and shorelands of navigable waters up to the ordinary high water level. *See* 382 F.2d at 669; *United States v. Twin City Power Co.,* 1956, 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240. The Ninth Circuit examined the Federal Power Act and determined that it did not delegate the dominant servitude of navigation. Thus, it found that in the circumstances before it a licensee must pay compensation because it, unlike the Government, takes something it does not already have. 382 F.2d at 672. With respect to power site values, the Court determined that the rule precluding assertion of power site value against the United States, *United States v. Twin City Power Co.,* 1956, 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240, goes "hand in hand" with the dominant navigational servitude and thus is not available to a licensee. 382 F.2d at 673–74.

Whether a licensee enjoys the dominant navigational servitude is irrelevant to the issue before us. The Ninth Circuit did not question that Section 21 delegates some of the federal government's powers. And the opinion does not support the contention that a licensee enjoys anything less than the full federal power to condemn private property. Significantly, when the Ninth Circuit turned to the amount of compensation due the shoreland and upland property owners it relied exclusively on federal cases. *See* 382 F.2d at 673–74.

*Tacoma* holds that Section 21 does not give a licensee power to condemn state-owned land. The theory of the case appears to be that Congress *could not* delegate such power to a state-created entity, rather than that it did not intend to do so. 207 P.2d at 577. This theory is questionable at best. *See First Iowa Hydro-Electric Cooperative v. Federal Power Commission,*

1946, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143; *Kohl v. United States,* 1876, 91 U.S. 367, 23 L.Ed. 449; *Washington Department of Game v. Federal Power Commission,* 9 Cir. 1953, 207 F.2d 391, 1954, *cert. denied,* 347 U.S. 936, 74 S.Ct. 626, 98 L.Ed. 1087.[22] Even if this holding is correct, it does not affect a licensee's power to acquire privately held land.

Although the Supreme Court has never ruled directly on the scope of the delegation of federal power in Section 21, *Federal Power Commission v. Tuscarora Indian Nation,* 1960, 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584, suggests that the delegation is not a limited one. As part of its case against condemnation by a FPC licensee, the Indian Nation argued that 25 U.S.C. § 177[23] applied to the condemnation of its lands. The Court rejected this contention:

> But § 177 is not applicable to the sovereign United States *nor hence to its licensees* to whom Congress has delegated federal eminent domain powers under § 21 of the Federal Power Act.

362 U.S. at 120, 80 S.Ct. at 555 (emphasis added). In its discussion of this point the Court cited decisions in which the United States was a party without any indication they would not be equally applicable to a federal licensee. *See* 362 U.S. at 120–21, 80 S.Ct. 543.

Similarly, in *Grand River Dam Authority v. Grand-Hydro,* 1948, 335 U.S. 359, 69 S.Ct. 114, 93 L.Ed. 64, the Supreme Court appears to draw no distinction between the federal government and its licensee under the Federal Power Act:

> If either the United States, or its licensee as such, were seeking to acquire this land under the Federal Power Act, it might face different considerations from those stated above.

---

**22.** Although the Supreme Court reversed *Tacoma* on the technical ground that the state litigation constituted an improper collateral attack on a FPC determination, the Court's opinion casts doubt on the validity of the state court's substantive holding as well. *See City of Tacoma v. Taxpayers of Tacoma,* 357 U.S. 320, 339–40, 78 S.Ct. 1209, 2 L.Ed.2d 1345.

**23.** No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. . . .

335 U.S. at 373, 69 S.Ct. at 121. *See also Public Utility District No. 1 v. City of Seattle*, 9 Cir. 1967, 382 F.2d 666, 675 (Byrne, J., dissenting), 1969, *cert. dismissed*, 396 U.S. 803, 90 S.Ct. 22, 24 L.Ed.2d 59.

In summary, we find no reason to ignore the general rule of following federal law to set compensation in a federal condemnation because the United States is not taking the land directly.

Second, the appellants have argued that the federal interest in the value of property taken in a Section 21 proceeding is so small that the analysis established by *Clearfield Trust Co. v. United States*, 1943, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 and its progeny, including most recently *Miree v. DeKalb County*, 1977, —— U.S. ——, 97 S.Ct. 2490, 53 L.Ed.2d 557, compels federal adoption of state law. Even if a sharp distinction between a licensee and the United States cannot be drawn, it may be that the federal interest in the price paid for licensed hydroelectric plants is less than in other government projects. If so, use of state law would be appropriate notwithstanding the usual rule that federal common law of compensation governs in federal condemnation.

A review of *Clearfield, Miree*, and other federal common law decisions fails to convince us, however, that state law should be followed. That review reveals a changing emphasis of factors and shifting preferences for one law or the other. In *Clearfield Trust* the Court chose uniform federal common law to govern an action against the United States on a federal check. The federal interest in uniformity for easier administration was sufficient to justify use of uniform federal common law. *See* 318 U.S. at 366, 63 S.Ct. 573; Comment, *Adopting State Law as the Federal Rule of Decision: A Proposed Test*, 43 U.Chi.L.Rev. 823, 831 (1976).

*United States v. Standard Oil Company*, 1947, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 also took a hospitable stance to the use of federal common law. That case posed the question whether the United States could recover for damages suffered when a serviceman is injured. The Court found first that the source of any legal right to recover should be federal. It then held such federal law should be uniform because there was no affirmative need for diverse results, the issue did not involve local concerns, and a uniform rule would be appropriate in fiscal matters. *Id.* at 310–11, 67 S.Ct. 1604.

Other cases diverge from this presumption favoring federal law. For instance, *Bank of America v. Parnell*, 1956, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 refused to extend the *Clearfield* approach of uniform law to suits between private parties simply because the subject matter of the controversy happens to be federal commercial paper. Instead, the Court indicated that an immediate federal interest must be involved. *Id.* at 33–34, 77 S.Ct. 119. And in *Wallis v. Pan American Petroleum Corp.*, 1966, 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369, the Supreme Court indicated that state law should usually govern unless a "significant conflict between some federal policy or interest and the use of state law in the premises" is shown. *Id.* at 68, 86 S.Ct. at 1304. *Accord Miree v. DeKalb County*, 1977, —— U.S. ——, 97 S.Ct. 2490, 53 L.Ed.2d 557. The Court found no such interest in *United States v. Yazell*, 1966, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404, a suit by the federal government to collect a debt owed the Small Business Administration. The Court held that Texas community property rules would apply because the Small Business Administration had individually negotiated the loan in the context of and with specific reference to Texas law and because the role of the United States as creditor in the case was no different from any private creditor. The Court also noted the intense local interest in family property and the protection of women, as well as the lack of any existing federal common law to apply. *Id.* at 346–53, 86 S.Ct. 500. In *United States v. Little Lake Misere Land Co.*, 1973, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187, on the other hand, the Supreme Court refused to adopt state law. The issue in *Little Lake* was whether a

state statute retroactively making mineral rights imprescriptible should govern federal land acquisitions under the Migratory Bird Conservation Act.[24] Adoption would have deprived the federal government of a contract transferring the mineral rights to the land in question ten years after its acquisition. The statute conflicted with the federal program because it deprived the government of its contractual interests and created uncertainty in land transactions under the Act. *Id.* 382 U.S. at 596–99, 86 S.Ct. 500.

Together these cases produce a balancing test. *See generally* Comment, *Adopting State Law as the Federal Rule of Decision: A Proposed Test*, 43 U.Chi.L.Rev. 799 (1976). On one side is the federal interest in carrying out a program in the most efficient and effective manner possible. On the other is a state's interest in the preservation of its control over local interests, particularly traditional interests such as family law and real property transactions, and in preventing displacement of state law. Of course, the ultimate goal of the creation of federal law by the courts is to carry out the federal program in question. *See United States v. Little Lake Misere Land Co.,* 412 U.S. at 584–601, 93 S.Ct. 2389; *United States v. Standard Oil Co.,* 332 U.S. at 309–11, 67 S.Ct. 1604. Thus, if state law would actually frustrate rather than only hinder a federal program, federal common law *must* be applied regardless of state interests. *See, e. g., United States v. Little Lake Misere Land Co.* On the other hand, the Supreme Court has demonstrated a growing desire to minimize displacement of state law. *See Miree v. DeKalb County,* 1977, —— U.S. ——, 97 S.Ct. 2490, 53 L.Ed.2d 557.

Each side of this controversy has provided us with weights for its side of the scale. Georgia Power points to the degree of federal involvement in a licensed project. A license is a prerequisite to construction of a project. 16 U.S.C. § 817 (1970). The design, construction, recreation facilities, and ecological impact of a project are subject to

approval by the FPC. 16 U.S.C. § 803, (1970), 18 C.F.R. § 4.41 *et seq.* (1977). The Commission has certain powers to regulate the rates and charges of electricity generated by the project. 16 U.S.C. §§ 812–13 (1970). Georgia Power also points out that the federal government has a financial interest in minimizing acquisition costs for a licensed project since it holds an option to acquire the project when the license expires upon payment of net investment, less certain items. 16 U.S.C. § 807 (1970). In addition, Georgia Power notes that the government may acquire a project in time of national emergency, 16 U.S.C. § 809 ·(1970).

The landowners emphasize that this lawsuit involves private parties and that Georgia Power (or any other licensee) is likely to condemn property only in the state where it operates. They also point out that property rights are a traditional state concern and that Georgia has an elaborate law of eminent domain that reflects considered policy judgments a state would want the federal courts to respect. Finally they contend that no substantial rights and duties of the United States hinge on the outcome of this litigation.

The balance tips toward the need for federal law. That this controversy is between private parties is not determinative. *Miree v. DeKalb County,* —— U.S. ——, ——, 97 S.Ct. 2490, 53 L.Ed.2d 557 (Burger, C. J., concurring); *United States v. Little Lake Misere Land Co.,* 412 U.S. at 592–93, 93 S.Ct. 2389; *Bank of America v. Parnell,* 352 U.S. at 34, 77 S.Ct. 119. Nor must we automatically apply state law because property is involved. *Little Lake* involved a property transaction. Moreover, eminent domain is not like most areas of property law, where state regulation has been virtually exclusive, but one where the United States has developed and exercises an independent power. *See, e. g., Kohl v. United States,* 91 U.S. 367, 23 L.Ed. 449.

One possible reason for adopting state law as the federal rule of decision is the

**24.** 16 U.S.C. § 715 *et seq.* (1970).

advantage of knowing what state law says compared with the uncertainty as to rules the federal courts would create. *See McKenna v. Wallis*, 5 Cir. 1965, 344 F.2d 432, 444 (Wisdom, J., dissenting), *rev'd sub nom., Wallis v. Pan American Petroleum Corp.*, 1966, 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369; Note, *The Federal Common Law*, 82 Harv.L.Rev. 1512, 1519 (1969). Since federal law on compensation already exists, there is no such reason to adopt state law here.[25]

Most importantly, federal common law of compensation is the appropriate choice in this case because the use of state law could interfere with achievement of congressional aims. Even when Congress passed the Federal Power Act in 1920 its primary concern was to stimulate private development of America's hydroelectric power resources. *See, e. g., First Iowa Hydro-Electric Cooperative v. Federal Power Commission*, 1946, 328 U.S. 152, 180, 66 S.Ct. 906, 90 L.Ed. 1143; 56 Cong.Rec. 9810 (remarks of Mr. LaFollette); H.R.Rep.No.715, 65th Cong., 2d Sess. 15. That goal has become even more significant with the energy shortages of the 1970's and the adoption of a national policy to reduce dependence on foreign sources of energy. To fulfil that congressional policy, hydroelectric development must be maximized. The use of state rules

of compensation when they would produce a substantially higher award for the landowner could retard development and frustrate the goal of full utilization of hydroelectric resources. If we considered only the increased cost to the Lake Wallace project from these appeals the interference with the federal policy might not appear significant. When, however, all the acquisitions for a major project are grouped together, and even more so when many licensed projects are considered as an aggregate, the increase in cost and the accompanying chill on development resulting from adoption of state rules such as those in Georgia would be substantial. State compensation rules could also interfere with the national interest in reducing energy costs because the higher land acquisition expenses would need to be offset by higher utility rates.

The federal government's option under Section 14 of the Act, 16 U.S.C. § 807, to acquire a project at the expiration of a license creates another United States interest in minimizing the cost of licensed facilities by applying federal valuation rules. *See First Iowa Hydro-Electric Cooperative v. Federal Power Commission*, 328 U.S. at 172–73, 66 S.Ct. 906;[26] *Public Utility District No. 1 v. City of Seattle*, 9 Cir. 1967, 382 F.2d 666, 675 (Byrne, J. dissenting) 1969,

---

**25.** At oral argument, appellants contended for the first time that there is no federal common law of compensation. They would limit *United States v. Miller*, 1943, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 and *Bauman v. Ross*, 1896, 167 U.S. 547, 17 S.Ct. 966, 42 L.Ed. 270, along with their rules that compensation need not include an increase in value created by the condemning project and may be offset by benefits created in remaining property, to the specific statutes implicated in the cases.

This contention should have been raised long ago so the trial court could have considered it. Without ruling on the propriety of the instructions actually given below—an issue not properly before us, *see, e. g., Commercial Credit Business Loans, Inc. v. St. Louis Terminal Field Warehouse*, 5 Cir. 1974, 514 F.2d 75, 77—we reject the appellants' general point that there is no federal common law of compensation. Cases such as *Miller* and *Bauman* have force independent of their statutory context. *See, e. g., United States v. Trout*, 5 Cir. 1967, 386 F.2d 216, 221. They hold that the compensation requirements of the fifth amendment—not sole-

ly of the statutes involved—are satisfied when project enhancement value is excluded and a set-off for specific benefits to remaining property is allowed. Only the fifth amendment limits the federal power of eminent domain, 1 *Nichols' The Law of Eminent Domain* §§ 1.14 & 1.3 (rev. 3d. ed. 1976). Since we find no indication that Congress did not delegate all of the federal power to condemn private property, the federal law defining the minimum compensation requirements of the fifth amendment becomes the law of compensation for a § 21 case.

**26.** In *First Iowa* the Supreme Court wrote:

The closeness of the relationship of the Federal Government to these [licensed] projects and its obvious concern in maintaining control over their engineering, economic and financial soundness is emphasized by such provisions as those of § 14 authorizing the Federal Government, at the expiration of a license, to take over the license project . . .

328 U.S. at 172–73, 66 S.Ct. at 915–16.

*cert. dismissed,* 396 U.S. 803, 90 S.Ct. 22, 24 L.Ed.2d 59. Congress expressed an interest in keeping this option price down when it passed the Federal Power Act. Rep. Ferris submitted a Minority Report to the original House Bill, because it did not include a provision limiting the option price of projects which had decreased in value to the fair value of the property taken, H.R.Rep. No.715, 65th Cong., 2d Sess. 40 (Minority Report). In Rep. Ferris' eyes, this omission meant the option price could be so high that no government would be justified in paying it. *Id.* at 40. Congress eventually added Rep. Ferris' amendment, thereby expressing an interest in controlling acquisition costs. Use of federal compensation standards would reduce the option price and further this congressional desire to make government acquisition a realistic possibility.

For these reasons, we find that nothing in *United States v. Clearfield Trust Co.* and its progeny gives reason to diverge from the practice of employing federal compensation rules in a federal compensation proceeding. If anything, those cases push toward use of the federal law. As required by *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369, a significant conflict between the federal policy of the Federal Power Act and the use of Georgia law can be shown.[27]

The appellants have raised a third argument against federal law in Section 21 cases. They contend that if we apply federal common law, licensees such as Georgia Power will have the choice of a Section 21 suit in federal court with federal rules or a suit in state court governed by state law.

27. Judge Simpson disputes this conclusion. He says our concern that Georgia law may interfere with the development of hydroelectric power has led us down the wrong path travelled by the panel majority in *McKenna v. Wallis.* Dissenting opinion, at p. 1198. We disagree. The legislative history to the Federal Power Act shows that Congress strongly sought full and rapid development of hydroelectric power. That federal interest is solid and important. The panel in *Wallis* relied on a federal policy against monopolization of federally owned mineral deposits as well as a policy of development. The Supreme Court reversed the panel not because those policies were abstract or unimportant, but because Louisiana law did not interfere with them.

*Wallis* turned on whether the interstices of a federal statute making federal oil and gas leases assignable should be filled with Louisiana law which did not recognize title by parol and resulting or constructive trusts. The panel majority's conclusion that Louisiana law would frustrate important policies rested on the unusual and speculative premise that:

> Trusts ex maleficio are part of the congressional scheme for carrying out the national policies on mineral resources and monopoly. In litigation between private persons over the nature of the ownership of a federal mineral lease, national policies on mineral resources and monopoly will suffer unless courts recognize beneficial title to the lease in a claimant whom the Secretary has not investigated and has not approved as lessee, and who may be unknown to the Secretary.

*McKenna v. Wallis,* 5 Cir. 1965, 344 F.2d 432, 447–48 (Wisdom, J., dissenting), *rev'd,* 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369.

The civil law of Louisiana was clear and both easy and inexpensive to apply. In some ways, it promoted federal interests better than the common law. 344 F.2d at 446 (Wisdom, J., dissenting). It is certainly difficult to see how the choice of Louisiana law would interfere with the policies the panel majority claimed to be protecting. The federal government has the power to disapprove assignments running afoul of the anti-monopoly policy no matter what law governs assignments. 384 U.S. at 70, 86 S.Ct. 1301. Nor did the panel explain how the trust ex maleficio—rarely invoked even in jurisdictions that recognize it—could encourage development.

The difference in this case arises from the simple fact that people are more hesitant to pay more money for property than they are to meet inexpensive filing requirements. That Georgia provides some formula of compensation does not mean state law offers a feasible route to the federal objective if the resulting cost is substantially higher. We disagree with the dissent's assertion that any interference from the Georgia statute is conjectural. Dissent, at p. 1190. In No. 75–4448 the difference amounts to $540 an acre—a substantial difference totaling almost $30,000 for that small tract alone. If Georgia law added a similar premium on every acre needed for the project the additional cost would be $11,456,100. Even if the average premium is only one-tenth of the one in No. 75–4448, the extra cost will be over $1,000,000. It is more than conjecture to conclude that such additional costs could interfere with the policy of full hydroelectric development.

This, they continue, is the type of forum shopping *Erie Railroad Co. v. Tompkins* condemns. *See also Hanna v. Plumer,* 1965, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8; *see generally,* Ely, *The Irrepressible Myth of Erie,* 87 Harv.L.Rev. 693 (1974). *Erie,* of course, does not apply directly to this litigation because the source of the Section 21 condemnation power is federal. *E. g., Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838.

Any broader implications of the *Erie* decision about the desirability of uniformity between state and federal courts do not apply here either. If a licensee were to bring a Section 21 condemnation action in a state court, that court would be required to follow the same law as a federal court even if that were federal common law. Friendly, *In Praise of Erie—And of the New Federal Common Law,* 39 N.Y.U.L.Rev. 383, 405 (1964). *See also* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart and Wechsler's The Federal Courts and the Federal System* at 825 (1973). If the proceeding in the state court is under the federal power, the defendant may remove. 7 *Moore's Federal Practice* ¶ 71A.10[2] at 71A–252 (2d ed. 1975).[28] Thus, there would not be different substantive rules of decision depending upon the forum chosen. If a licensee brought a *state* condemnation action in state court, state law would govern. *E. g., Grand River Dam Authority v. Grand Hydro,* 335 U.S. at 372–73, 69 S.Ct. 114. But, if a state condemnation action were brought in federal court—assuming there is jurisdiction[29]—state law would also govern of its own force under *Erie.* 12 Wright & Miller, *Federal Practice and Procedure: Civil* § 3055 (1973). Again, there

would be no difference in substantive law according to forum. Insofar as the appellants' argument rests on the possibility that different substantive rules might be applied in a *state* action in state court compared with a *federal* action in federal court, they can find no comfort in *Erie.* Justice Brandeis said nothing about a need for uniformity in different causes of action based on similar or even identical facts.

## IV.

The appellants argue *to us* that a decision to apply federal common law in this litigation would render Section 21, as applied, unconstitutional. The theory is that a law permitting Georgia Power to "grant" the benefits of Georgia law arbitrarily through its choice of forum denies equal protection to landowners sued under the federal rather than the state statute. This contention was mentioned (though not developed) in several of the original answers to Georgia Power's condemnation complaint, but otherwise appears to have received no attention below.[30] Part of the argument rests on a disputed factual assertion that Georgia Power arbitrarily discriminates among condemnees by bringing some state suits in state court, where the court would apply the more generous compensation formula, against landowners situated similarly to appellants. The district court had no opportunity to rule on this factual dispute or the equal protection argument. Therefore, we need not consider them. *See, e. g., Commercial Credit Business Loans, Inc. v. St. Louis Terminal Field Warehouse,* 5 Cir. 1974, 514 F.2d 75, 77; *E. E. O. C. v. Stan-*

---

**28.** A state based condemnation brought in state court by a federal licensee is not removable. 7 *Moore's Federal Practice* ¶ 71A.10[2] at 71A–253 (2d ed. 1975); *Algonquin Gas Transmission Co. v. Gregory,* D.Conn.1952, 105 F.Supp. 64, *cert. denied,* 344 U.S. 818, 73 S.Ct. 13, 97 L.Ed. 637.

**29.** Since § 21 does not appear to grant jurisdiction over state based condemnations, *but see Oakland Club v. South Carolina Public Service Ass'n,* 4 Cir. 1940, 110 F.2d 84, 86 and since a licensee's claim based on state law is not a federal question for purposes of jurisdiction on

the basis of a general federal question, 7 *Moore's Federal Practice* ¶ 71A.11 (2d ed. 1975), such jurisdiction would most likely be based upon diversity of citizenship. *See* 12 Wright & Miller, *Federal Practice and Procedure: Civil* § 3055 (1973), 13 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3577 (1975).

**30.** The district court did not mention the issue in its order denying the motion to apply federal law.

*dard Forge and Axle Co.,* 5 Cir. 1974, 496 F.2d 1392, 1394–95; *D. H. Overmyer Co. v. Loflin,* 5 Cir. 1971, 440 F.2d 1213, 1215, *cert. denied,* 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90. To the extent the equal protection issue is before us, we find it without merit. There can be no contention that any landowner will be awarded constitutionally inadequate compensation if federal law controls since the federal rules satisfy the requirements of the fifth amendment. *See, e. g., United States v. Miller,* 1943, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336. Nor can we seriously consider the possibility that there are constitutional difficulties whenever a prosecutor or other plaintiff meeting state action requirements may choose between two or more causes of action with different consequences for defendants. If there were, the Justice Department could not constitutionally choose to bring a civil antitrust suit against one offender and a criminal suit against another.

## V.

The appellants have made several other arguments in their briefs and at oral argument which we regard as unnecessary to discuss in this opinion. We have, however, considered these arguments. We find them to be without merit.

NO. 75–4448—AFFIRMED.

NO. 77–1327—AFFIRMED AND REMANDED FOR FURTHER PROCEEDINGS.

SIMPSON, Circuit Judge, dissenting:

Congress, in enacting a general scheme for the regulation of hydroelectric power, has authorized a state party licensed by the Federal Power Commission to bring a federal eminent domain action, but has failed to specify whether state or federal law should govern the measure of compensation. It is our function as a federal court to choose which law to apply, neither having been legislatively mandated. Our choice must follow the Supreme Court's pronouncements regarding federal common law. Believing that the majority in this case has wrongly chosen to apply federal law, I dissent in order to register the reasons for my disagreement.

## I. WHEN AND HOW TO MAKE A CHOICE OF LAW

In exercising its commerce power to enact a comprehensive regulatory plan, Congress recognized a distinct federal interest in the use of navigable waters for producing hydroelectric power. 16 U.S.C. §§ 791a et seq. (1970) (The Federal Power Act). As is the case with any federal legislation, Congress acted "against the background of the total *corpus juris* of the states". *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966), citing Hart & Wechsler, The Federal Courts and the Federal System 435 (1953). Although the federal statute necessarily displaces some state law, the " 'presence of a federal statute does not necessarily imply that there is a congressional intent that any particular issue be resolved by reference to federal law' ".[1] "Whether latent federal power should be exercised to displace state law is primarily a decision for Congress". *Wallis, supra,* at 68, 86 S.Ct. at 1304. A choice of law problem arises when Congress has failed to make that decision; the courts must then fill the vacuum by deciding which law shall govern. As Judge Friendly has put it:

> The issue that must be determined in each instance is what heed Congress intended to have paid to state law in an area where no heed need constitutionally be paid—more realistically, in Gray's famous phrase, "to guess what it would have intended on a point not present to its mind, if the point had been present".[2]

1. Note, *The Competence of Federal Courts to Formulate Rules of Decision,* 77 Harv.L.Rev. 1084, 1090 (1964), cited in *McKenna v. Wallis,* 344 F.2d 432, 450 (5th Cir. 1965) (Wisdom, J., dissenting), *rev'd sub nom., Wallis v. Pan American Petroleum Corp.,* 382 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966).
2. Friendly, *In Praise of Erie—And of the New Federal Common Law,* 39 N.Y.U.L.Rev. 383, 410 (1964).

Regardless of whether state or federal law is chosen, "the question is one of federal policy . . . . And the answer to be given necessarily is dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law". *United States v. Standard Oil Co.,* 332 U.S. 301, 309–10, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067 (1947). In his prescient dissent in *McKenna v. Wallis,* Judge Wisdom explained how the principles of federalism affect the choice of law:

> Before a court plugs a statutory gap with federal law that is inconsistent with local law . . . consideration for the position of the states in the federal system suggests that the Court find congressional intent that federal common law should prevail over state law. . . .
> When congressional intent is unclear or when a specific congressional intent never existed, a reasonable criterion is that judge-made common law should not prevail over local law unless that result is manifestly in the national interest. 344 F.2d at 444–45.

Judge Wisdom's view prevailed in the Supreme Court. In reversing the Fifth Circuit in *Wallis,* the Court stated: "In deciding whether rules of federal common law should be fashioned, normally the guiding principle is that a significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown." *Wallis, supra,* at 68, 86 S.Ct. at 1304. This language nearly, if not quite, establishes a presumption favoring state law in choice of law cases.[3]

A review of the Supreme Court's decisions in this area reveals a far more certain direction than what the majority calls "a changing emphasis of factors and shifting preferences for one law or the other". Majority opinion, *supra* at 1188. Because the decision is one of federal policy, it will always be possible to identify some federal interest, and thus some conflict with state law necessitating a choice.[4] The key, as stated in *Wallis,* is that this conflict be "significant". Thus, in the seminal case of *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), federal law was chosen because

> [t]he issuance of commercial paper by the United States is on a vast scale . . . . The application of state law . . . would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain. *Id.* at 367, 63 S.Ct. at 575.

In *Standard Oil Co. v. United States, supra,* the strength of the federal interest argued forcefully in favor of applying federal law: "perhaps no relationship between the Government and a citizen is more distinctively federal in character than that between it and members of its armed forces". 332 U.S. at 305, 67 S.Ct. at 1607. Similarly, in *United States v. Little Lake Misere Land Co., Inc.,* 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973), state law directly hostile to a clear, congressionally declared federal interest was displaced because:

> [t]o permit state abrogation of the explicit terms of a federal land acquisition would deal a serious blow to the congressional scheme contemplated by the Mi-

---

**3.** Judge Wisdom favored such a presumption in his *Wallis* dissent when he wrote: "The political logic of federalism supports placing the burden of persuasion on those urging national action". 344 F.2d at 445, quoting Wechsler, *The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government,* 54 Colum. L.Rev. 543, 545 (1954). I find it incongruous that Judge Wisdom, whose position in *Wallis* was adopted by the Supreme Court, today di-

lutes his own proposition of a decade ago by writing that "the Supreme Court has demonstrated a growing desire to minimize displacement of state law", majority opinion, supra at 1189.

**4.** Of course, if application of either federal or state law would yield the identical result, there is no need to make a choice. See, e. g., *United States v. 3,595.98 Acres of Land,* 212 F.Supp. 617 (N.D.Cal.1962).

gratory Bird Conservation Act and indeed to all other federal land acquisition programs. These programs are national in scope. . . . Certainty and finality are indispensable in any land transaction, but they are especially critical when, as here, the federal officials carrying out the mandate of Congress irrevocably commit scarce funds. *Id.* at 597, 93 S.Ct. at 2399.

In contrast, where the federal interest is attenuated or speculative, the cases favor application of state law absent a showing that such law is clearly inadequate to serve the federal interest. Thus, in *Bank of America National Trust and Savings Association v. Parnell,* 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956), state law was applied because the possibility that "the floating of securities of the United States might somehow or other be adversely affected by the local rule of a particular State regarding the liability of a converter . . . is far too speculative, far too remote a possibility to justify the application of federal law to transactions essentially of local concern". *Id.* at 33, 77 S.Ct. at 121. In *Wallis v. Pan American Petroleum Corp., supra,* although a panel of this Court concluded that the federal interest in promoting exploration for development of domestic reserves of oil and gas, as expressed in the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181 et seq., demanded application of federal common law to the assignability of leases, 344 F.2d at 441–442, the Supreme Court disagreed: "However fitting this approach may be where a State interposes unreasonable conditions on assignability, it can have no force in this instance because Louisiana concededly provides a quite feasible route for transferring any mineral lease . . ." 384 U.S. at 71, 86 S.Ct. at 1305. This Court was again reversed in *Miree v. DeKalb County, Ga.,* —— U.S. ——, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), in which the survivors of deceased airline passengers attempted to sue the county, as owner of a municipal airport, on a third party beneficiary theory, claiming protection under a contract between the county and the Federal Aviation Administration. The county claimed immunity from suit under Georgia law. Holding that state law should be applied, the Court noted that even though "the United States has a substantial interest in regulating aircraft travel and promoting air travel safety", this interest was too remote and speculative to warrant application of federal law "given the narrow question before us". *Id.* at ——, 97 S.Ct. at 2495.

## II. CHOICE OF LAW AND COMPENSATION IN FEDERAL CONDEMNATIONS

My first point of departure from the majority is in their apparent conclusion that the rules governing choice of law are different in the context of compensation in federal eminent domain actions. The majority states that "[c]ourts apply independent rules, however, when considering the specific issue of compensation in federal condemnations", and considers itself bound to follow these "independent rules" "unless there are circumstances unique to a federal condemnation under Section 21 which require the opposite result". Majority opinion, supra, at 1186. After rejecting possible distinctions based on Section 21, the majority concludes: "In summary, we find no reason to ignore the general rule of following federal law to set compensation in a federal condemnation because the United States is not taking the land directly". Id. at 1188.

With due respect, I think the majority misreads the cases dealing with choice of law in federal condemnation. The cases cited by the majority opinion, beginning with *United States v. Miller,* 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943), clearly establish that compensation in federal condemnation *is a federal question.*[5] What these cases do not establish, as I think the

---

**5.** " 'Just compensation' is a federal question, as to which the state decisions are not authorita- tive". *United States v. City of New York,* 165 F.2d 526, 528 (2nd Cir. 1948).

majority incorrectly interprets them, is that the federal common law of compensation is presumed to govern in all federal condemnations.[6] This distinction was concisely explained by Judge Friendly in his analysis of *Clearfield Trust* :

> *Clearfield* decided not one issue but two. The first . . . is that the right of the United States to recover for conversion of a Government check is a federal right, so that the courts of the United States may formulate a rule of decision. The second . . . is whether, having this opportunity, the federal courts should adopt a uniform nation-wide rule or should follow state law.[7]

In federal condemnation actions compensation is clearly a federal question. But whether it is resolved by substantive state or federal law presents a choice of law problem no different from any other: the choice "is dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law". *Standard Oil, supra,* 332 U.S. at 309–10, 67 S.Ct. at 1609.[8]

---

**6.** In *Miller,* respondents argued that state law should be applied because Congress had so required. The Court replied:

> We need not determine what is the local law, for the federal statutes upon which reliance is placed require only that, in condemnation proceedings, a federal court shall adopt the forms and methods of procedure afforded by the law of the State in which the court sits. They do not, and could not, affect questions of substantive right,—such as the measure of compensation,—grounded upon the Constitution of the United States. 317 U.S. at 379–80, 63 S.Ct. 283 [footnotes omitted].

This language is subject to many interpretations. To the extent that it may read to indicate that Congress "could not" apply state law to "the measure of compensation", it is dicta and of doubtful validity. Some courts have read *Miller* this broadly. *See, e. g., United States v. 63.04 Acres of Land,* 154 F.Supp. 198, 202 (E.D.N.Y.1957) ["Since we are dealing with a federal question (just compensation), the State Court rules or criteria are not controlling or persuasive".]; 12 Wright & Miller, Federal Practice and Procedure: Civil § 3042 (1973). The principles of federalism argue strongly against so absolute a rule. Surely the theory underlying this rule was rejected by the Supreme Court in *Clearfield Trust* when it observed: "In our choice of the applicable *federal* rule we have occasionally selected state law". 318 U.S. at 367, 63 S.Ct. at 575 (emphasis added). *See also Illinois v. City of Milwaukee, Wis.,* 406 U.S. 91, 107, 92 S.Ct. 1385, 1395, 31 L.Ed.2d 712 (1972) ["While federal law governs, consideration of state standards may be relevant".]

The majority argues that it has not misread the cases it cites because "the cases take the second step. They chose to apply uniform nation-wide rules". Majority opinion, supra, at 1186 n. 21. The issue, however, is *why* federal law was chosen in each of those cases—what specific federal interests dictated that choice. Without analyzing those interests in depth here, see, e. g. notes 8 and 10, *infra,* I do note that in each of the cited cases the United States was the party condemning *and paying for* the land. In the instant case, a state utility will pay for the land. Surely this is relevant to determining the nature of the interests at stake. See note 11 *infra.*

**7.** Friendly, *supra* note 2, at 410. Judge Friendly applied this two-step analysis in *United States v. Certain Property,* 344 F.2d 142 (2nd Cir. 1965):

> Next, says the Government, the question what the United States takes when it files a declaration of taking of real property is a question as to which federal courts *may* make an independent determination, free from any requirement . . . to follow state law. We fully agree. Where we break off from the Government is at its third proposition—that the interest in nation-wide uniformity of federal condemnation makes it imperative for federal courts to *use* this freedom to ignore state property law in determining what the United States takes when it takes "real estate". *Id.* at 144 (citations omitted).

**8.** *United States v. 93.970 Acres of Land,* 360 U.S. 328, 79 S.Ct. 1193, 3 L.Ed.2d 1275 (1959), supports this view. In that case, the Supreme Court refused to apply a state election of remedies law where the United States sought, in one action, to condemn land and adjudicate the rights of a third party claiming a possessory interest in the land. The state law would have been manifestly unfair to the Government, presenting it with "a Hobson's choice". As the Court noted, "[w]e have often held that *where essential interests of the Federal Government are concerned,* federal law rules unless Congress chooses to make state laws applicable. It is apparent that no such choice has been made here". *Id.* at 332–33, 79 S.Ct. at 1196. [citations omitted]. Thus, the Court did not automatically apply federal law. Rather, it looked to the classic choice of law factors: nature of the federal interest, hostility of the state law, and congressional intent.

## III. CHOICE OF LAW INTEREST ANALYSIS IN THE INSTANT CASE

Because I view this case as presenting a traditional choice of law question, I think it is highly relevant that the federal eminent domain power here is exercised pursuant to Section 21 and that the United States is not a party to the action. These distinctions significantly color the "specific governmental interests" involved and dictate a choice of law other than that made by the majority.

I agree that the Federal Power Act delegates the full federal power of eminent domain to a licensee under Section 21, but I think the majority is off base in concluding that this full delegation renders irrelevant any distinction between the United States and licensees as parties to a condemnation. Our focus should be directed toward the *interests* of the parties, not toward the degree of delegation. The Act clearly expresses a legislative finding that the United States has a distinct interest, one greater than that of a licensee. Under Section 7(b) of the Act, 16 U.S.C. § 800(b), the Federal Power Commission may not issue a license where it has found that "the development of any water resources for public purposes should be undertaken by the United States itself". *See Udall v. F. P. C.*, 387 U.S. 428, 87 S.Ct. 1712, 19 L.Ed.2d 869 (1967). I thus find persuasive the reasoning of the Ninth Circuit in *Public Utility District No. 1 of Pend Oreille Co. v. City of Seattle*, 382 F.2d 666, 669–70 (9th Cir. 1967), cert. dismissed, 396 U.S. 803, 90 S.Ct. 22, 24 L.Ed.2d 59: [9]

We first observe that the position of a licensee is distinguishable from that of the United States with respect to furthering the national interest. By issuance of a license the United States is not acting in the national interest through the licensee to the same extent as it would if it undertook the project itself. The United States acts in the public interest on a national scale; the licensee often on a local scale, on projects thought to be of insufficient dimensions to warrant the assertion of national power. In many cases the requirements of federal permission and regulation are all that the national interest requires. Frequently the licensee is a privately owned utility or even manufacturer, seeking the license for purposes of profit.

For these reasons, I conclude that a Section 21 condemnation does not involve the same degree of federal interest as a condemnation by the United States itself.[10]

The majority concedes that "[e]ven if a sharp distinction between a licensee and the United States cannot be drawn, it may be that the federal interest in the price paid for licensed hydroelectric plants is less than in other government projects. If so, use of state law would be appropriate . . . .", majority opinion at 1188. After weighing the relative state and federal interests, the majority concludes that "[t]he balance tips toward the need for federal law", majority opinion, supra at 1189. Herein lies my second point of departure.

Georgia's interest in having its compensation law applied is manifest. This case involves only Georgia parties and Georgia

---

**9.** Although the Ninth Circuit offered this analysis in support of its finding that Section 21 does not delegate full eminent domain power, I cite it here because of its relevance to determining state and federal interests in this case.

**10.** The majority contends that simply because "the property will be used privately is not reason enough" to draw a distinction, noting that "[i]n *Miller*, for instance, the United States took land for use by a private railroad", majority opinion at 1186. Examination of the facts in *Miller*, however, reveals a significant federal interest in the taking there—an interest which by traditional choice of law standards amply justified the application of federal law. The United States condemned the land in question to allow relocation of private railroad tracks which otherwise would have run directly through an area soon to be flooded by the Central Valley Reclamation Project in California. In 1935, Congress authorized the appropriation of $12,000,000 for this project, construction of which was approved by President Roosevelt in December of that year. In the next two years, Congress appropriated another $19,400,000 for the project. 317 U.S. at 370–71, 63 S.Ct. at 278.

land. The state's law of compensation is more favorable to the landowner than is the federal law. As a federal court we are not concerned with the wisdom of that policy; all that is relevant to our consideration is that Georgia has decided how best to serve the interests of its citizens. Absent the fact that the state utility here is exercising a federal power pursuant to a federal statute, this would be a classic case of traditionally and exclusively local concern.

But the majority, in construing the Federal Power Act, finds a "significant conflict" with state law as required by *Wallis*: "federal common law of compensation is the appropriate choice in this case because the use of state law could interfere with achievement of congressional aims", majority opinion, supra at 1190. The majority cites two aims of the statute. Neither, I submit, is threatened by the application of state law.

The majority notes in the first place that the "primary concern" of Congress in passing the Act "was to stimulate private development of America's hydroelectric power resources", majority opinion, supra at 1190. This goal is frustrated in jurisdictions where, as here, the state law of compensation produces a substantially higher award for the landowner. This assumption I view as much too conjectural to afford a basis for application of federal law. The majority admits that the increased cost of the project involved in this case might not substantially interfere with federal goals; it is only when "all the acquisitions for a major project are grouped together, and even more so when many licensed projects are considered as an aggregate", majority opinion, supra at 1190, that the "accompanying chill" on development becomes significant. We have been presented with no data as to such aggregate costs or, for that matter, whether the laws of other states present a similar conflict with federal law. It was precisely this type of rationale—to remove "obstacles to exploration for development" —which led this Court astray in *McKenna v. Wallis*, 344 F.2d at 441. In reversing the Fifth Circuit, the Supreme Court cautioned that while such a rationale might be "fitting . . . where a State interposes unreasonable conditions . . . it can have no force" where the state law "provides a quite feasible route" to accomplish the immediate goal—in that case, to assign a lease, here, to compute just compensation. 384 U.S. at 70, 86 S.Ct. at 1305.

Secondly, the majority finds a direct federal interest "in minimizing the cost of licensed facilities by applying federal valuation rules", majority opinion, supra at 1190, because under Section 14 of the Act, the federal government has the option to acquire a project at the expiration of a license. 16 U.S.C. § 807. I cannot accept the majority's conclusion that "[u]se of federal compensation standards would reduce the option price and further this congressional desire to make government acquisition a realistic possibility", majority opinion, supra at 1191. Again, we lack the data to conclude that the additional cost imposed under Georgia law would make federal acquisition less than "a realistic possibility". Furthermore, the statute does not clearly mandate inclusion of that extra cost in the federal option price.[11] Of course, we have no way of knowing at this point if the

11. In defining the option price, the statute provides that the United States "shall pay the net investment of the licensee in the project or projects taken, not to exceed the fair value of the property taken . . . " 16 U.S.C. § 807. Thus, while the concept of "net investment" is affected in the abstract by a higher price paid for a project when state compensation law is applied at the time of licensee acquisition, the statute limits the concept to "the fair value of the property taken . . . " if and when the federal option is exercised. The question here is whether "fair value" is also to be computed on the basis of state law or whether a uniform federal standard should be applied. Arguably, a stronger case for the application of federal law can be made here because there is a direct federal interest: the federal government is paying out of its own funds to acquire the project. Whether this is the construction of Section 14 that will ultimately prevail I do not forecast. These problems of interpretation are raised only to stress that whether the price paid by a state party in a Section 21 condemnation will affect the price later paid by the federal government in exercising its option under Section 14 is by no means certain.

United States ever will exercise its option at all. At best, then, the effect on the fiscal interests of the United States is highly speculative.[12] When this court evinced similar solicitude for the federal fisc in *Miree v. DeKalb County, Ga., supra,* the Supreme Court reversed because "the resolution of petitioners (sic) breach of contract claim against respondent will have no *direct* effect upon the United States or its Treasury". —— U.S. at ——, 97 S.Ct. at 2494.

Finally, there is a single, telling argument which effectively refutes the majority's reading of congressional intent. In finding that "Congress did not believe it necessary to follow state eminent domain rules or desire courts to do so," majority opinion, supra at 1183, the majority overlooks the fact that Congress left up to the licensee whether to acquire land through a Section 21 action or a state condemnation. The majority admits: "If a licensee brought a *state* condemnation action in state court, state law would govern.", majority opinion, supra at 1192. It is well established that "under this Act . . . the condemnor has an election to exercise the power of eminent domain either under the specified enumerations of the Federal Power Act or under" the law of the state. *Oakland Club*

*v. South Carolina Public Service A.,* 110 F.2d 84, 86 (4th Cir. 1940), cited with approval in *Chapman v. Public Utility District No. 1,* 367 F.2d 163, 167 (9th Cir. 1963). This Circuit has recognized that the state eminent domain power is "separate and distinct" from that granted a licensee under a federal statute analogous to Section 21. *Robinson v. Transcontinental Gas Pipe Line Corp.,* 421 F.2d 1397, 1398 (5th Cir. 1970). Congress' commerce power is plenary. Presumably, if Congress could *forbid* the construction of hydroelectric facilities using navigable waters without a license granted by the FPC, 16 U.S.C. § 817,[13] it could have required application of federal law in *any* condemnation to secure land for purposes of building such facilities. That it did not do is significant.[14]

Rather, "[i]n the Federal Power Act there is a separation of those subjects which remain under the jurisdiction of the states from those subjects which the Constitution delegates to the United States and over which Congress vests the Federal Power Commission with authority to act". *First Iowa Hydro-Elec. Coop. v. FPC,* 328 U.S. 152, 167, 66 S.Ct. 906, 913, 90 L.Ed. 1143 (1946). "The Act leaves to the states their

12. In *Grand River Dam Authority v. Grand-Hydro,* 335 U.S. 359, 69 S.Ct. 114, 93 L.Ed. 64 (1948), petitioner argued that because of the strong federal interest, the Oklahoma Supreme Court was required to apply federal law in an eminent domain action by a state agency to condemn land for a power site. The Court rejected this argument. Petitioner raised, inter alia, the fact that the United States had an option to acquire the project after the license expired. The Court responded: "Such a recapture of the project is even more remote than a determination of a rate base . . . . We accordingly express no opinion upon the issues which may arise when, as and if the above-mentioned proceedings may be taken". *Id.* at 375, 69 S.Ct. at 122.

13. "The point is that navigable waters are subject to national planning and control in the broad regulation of commerce granted the Federal Government. . . . [T]he plenary power of Congress over navigable waters would empower it to deny the privilege of constructing an obstruction in those waters. It may likewise grant the privilege on terms. It is no objection to the terms and to the exertion of the power that 'its exercise is attended by the

same incidents which attend the exercise of the police power of the states.' The Congressional authority under the commerce clause is complete unless limited by the Fifth Amendment". *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 426–27, 61 S.Ct. 291, 308, 85 L.Ed. 243 (1940). This passage casts doubt on the majority's statement that "it is not certain that Congress had the power to compel such uniformity". Majority opinion, supra, at 1183 n. 16.

14. "As to the question whether the Federal Power Act should be interpreted as actually superseding the state law of condemnation and as restricting the measure of valuation which lawfully may be used by the courts of Oklahoma in a condemnation action for the acquisition of land for power site purposes by an agency of that State, there is nothing in the Federal Power Act to indicate that an attempt has been made by Congress to make such a nationwide change in state laws". *Grand River Dam Authority v. Grand-Hydro,* 335 U.S. 359, 374, 69 S.Ct. 114, 121, 93 L.Ed. 64 (1948).

traditional jurisdiction subject to the admittedly superior right of the Federal Government, through Congress, to regulate interstate and foreign commerce". *Id.* at 171, 66 S.Ct. at 915. Congress was careful not to cast the regulation of hydroelectric plants in an entirely federal mold; it decided to leave many of the incidents of regulation to the states.[15] The legislative history shows no concern by Congress over whether licensees pay for condemned land according to state or federal rules of compensation. Congress had—but failed to exercise—the power to assure application of a uniform, *federal* standard in *any* exercise of eminent domain power, state or federal, to acquire land on which to build these federally regulated facilities. Against this background, I cannot concur in the majority's exotic interpretations of an intent that Congress surely never had.

### IV. CONCLUSION

In sum, I do not dispute that there is a great national interest in promoting the development of domestic sources of energy. But it is for Congress, in the first instance, to say how this interest is to be achieved. Where the federal regulatory scheme comes in conflict with state law and thus with a state interest, we need some affirmative indication that Congress intended the federal common law to govern before we go about displacing state law. Such an indication might be inferred from the mere presence of a conflict significant in that it substantially impedes achievement of federal aims. Otherwise, we are to presume that Congress felt the national interest adequately served by application of state law.

I do not think it can fairly be said that Congress intended the result reached by the majority. Failing that, we are left to analyze the respective federal and state interests in determining which law to apply. Against clear, substantial and immediate state interests we are met with only speculative, attenuated national concerns and offered no persuasive arguments as to why the Georgia law of compensation is unreasonable or inadequate to achieve the broad goals of the Federal Power Act. I conclude that "the application of federal common law to resolve the issue presented in this case would promote no federal interests even approaching the magnitude of those found in *Clearfield*". *Miree, supra,* —— U.S. at ——, 97 S.Ct. at 2493. Thus, there is no "significant conflict". Georgia's law should be applied.

To put it simply: We had to make a choice of law, but I am convinced that the majority has made the wrong choice.

I respectfully dissent.

---

15. "The resulting integration of the respective jurisdictions of the state and Federal Governments, is illustrated by the careful preservation of the separate interests of the states through-out the Act, without setting up a divided authority over any one subject". *First Iowa Hydro-Elec. Coop., supra*, 328 U.S. at 174, 66 S.Ct. at 916.