UNITED STATES of America,
Appellant,

v.

O. C. TROUT, Jr. and wife, Dora S.
Trout, Appellees.

O. C. TROUT, Jr. and wife, Dora S.
Trout, Appellees,

v.

UNITED STATES of America,
Appellant.

No. 24186.

United States Court of Appeals
Fifth Circuit.

Dec. 4, 1967.

William O. Murray, Jr., 1st. Asst. U. S. Atty., San Antonio, Tex., Edwin L. Weisl, Jr., Asst. Atty. Gen., Roger P. Marquis, Elizabeth Dudley, Raymond N. Zagone, Attys., Dept. of Justice, Washington, D. C., Ernest Morgan, U. S. Atty., San Antonio, Tex., Charles Andrew Gary, Asst. U. S. Atty., San Antonio, Tex., for appellant.

Edward W. Watson, Galveston, Tex., for O. C. Trout, and another, appellees-appellants. Eastham, Watson, Dale & Forney, Galveston, Tex., of counsel.

Before WISDOM, THORNBERRY and GOLDBERG, Circuit Judges.

THORNBERRY, Circuit Judge:

This appeal is from a judgment of the district court awarding appellees, Mr. and Mrs. Trout, $72,202 as the fair market value of 210 acres condemned by the United States for the purpose of building the Canyon Dam in Comal County, Texas. Appellees had owned a 731.9-acre ranch bordering on the banks of the Guadalupe River since 1942. The United States filed the Petition for Condemnation and Declaration of Taking in January, 1960. The 210 acres taken in fee encompassed all of the Trouts' wooded land and fertile fields as well as all of their improvements for residential and ranching purposes except one hog pen. The 521.9 acres remaining to the owners could be described as caliche-rock country, far less valuable for ranching than was the land taken. In the Declaration of Taking, just compensation for the land taken was estimated at $62,645

2

and that sum was deposited. As the landowners would not agree that this amount represented just compensation, the United States proceeded to file a complaint in federal district court pursuant to 28 U.S. C. § 1358. The district court thereupon exercised its discretionary authority under Fed.R.Civ.P. 71A (h) to submit a case involving the power of eminent domain to a commission.[1] After three separate hearings, the commission filed a report in March, 1966, which was adopted by the district court. Although we regret that this case has already consumed the litigants' time and energies for nearly eight years, we are nevertheless constrained to reverse and remand for further proceedings.

## I.

▇ At the first hearing on August 13, 1962, the witnesses for appellees were

Mr. Trout himself and G. E. Melliff, an independent appraiser. The questions asked by counsel were designed to elicit opinions of value. Stated generally, the correct measure of value in a case involving condemnation of part of a tract is the fair market value of the entire tract immediately before the taking less the fair market value of the remainder immediately afterwards. Mr. Trout valued the entire property before the taking, including the improvements, at $140,000 and the acreage remaining afterwards at $25,000. He placed a minimal value on the remainder because he did not know what he could do with it. Though he placed a low value on the remainder and valued some of the property taken as high as $750 per acre, he admitted on cross-examination that he had never made a study of what similar property sold for in the area.[2] Mr. Mel-

[1]. Fed.R.Civ.P. 71A (h) provides as follows:

If the action involves the exercise of the power of eminent domain under the law of the United States, any tribunal specially constituted by an Act of Congress governing the case for the trial of the issue of just compensation shall be the tribunal for the determination of that issue; but if there is no such specially constituted tribunal any party may have a trial by jury of the issue of just compensation by filing a demand therefor within the time allowed for answer or within such further time as the court may fix, unless the court in its discretion orders that, because of the character, location, or quantity of the property to be condemned, or for other reasons in the interest of justice, the issue of compensation shall be determined by a commission of three persons appointed by it. If a commission is appointed it shall have the powers of a master provided in subsection (c) of Rule 53 and proceedings before it shall be governed by the provisions of paragraphs (1) and (2) of subdivision (d) of Rule 53. Its action and report shall be determined by a majority and its findings and report shall have the effect, and be dealt with by the court in accordance with the practice, prescribed in paragraph (2) of subdivision (e) of Rule 53. Trial of all issues shall otherwise be by the court.

[2]. As to Mr. Trout's valuation of the entire property before the taking, the following testimony is representative:

Q When you arrive at your opinion as to what you consider that it would sell for on a market, what did you use as a guide to determine that, other than what you have already told me?
A I would only repeat it, just exactly.
Q Sales down on the bayou, in your area of Galveston [Texas Gulf Coast], is that correct?
A Only as a basis; it is not a basis of comparison; it is just what I know people have bought in different areas.
Q Did you use any sales in this general area [Central Texas]?
A Not on the river, not this general area, no. I stated to you in the beginning that I made no study of sales on the river front lots before I put this in.

(R. 193). As to his valuation of the remainder, the following testimony is representative:

Q Mr. Trout, you know what market value means and I will ask the chairman to correct me if I'm wrong on this definition: It means what a willing seller would take and a willing buyer would pay, neither forced, neither under compulsion to sell and given a reasonable time in which to consummate a sale. Bearing that definition in mind, and considering also that a seller would be reasonably informed and a buyer would be reasonably informed as to all the facts, bearing that definition

liff valued the entire property before the taking, including improvements, at $112,-683 and the remainder at $13,757, the difference being $98,926. He testified that he considered the highest and best use of the property before the taking to be ranching and agriculture and the highest and best use of the remainder to be grazing. He, like Mr. Trout, admitted on cross-examination that he had not studied land sales in the area though he knew there was a demand for lakeside subdivision as a result of the Canyon Dam project.[3]

Murrah Nolte, an experienced staff appraiser with the United States Corps of Engineers, presented the evidence for the Government. He valued the entire property before taking at $116,180. This amount included improvements and also $18,200 worth of general benefits. The amount ear-marked for general benefits reflected increased property values over the county resulting from the contemplated government project. The total valuation was based on six sales of property in the area between 1954 and 1958. These sale prices ranged between $70 and $308 per acre, some of the land sold being comparable to Mr. Trout's pasture land and some of it being comparable to his river bottom and crop land. Nolte valued the remainder after the taking at $113,200, thus estimating appellees' loss at approximately $3,000. His appraisal included the same estimate of $18,200 for general benefits and also an estimate of $55,000 for special benefits. This latter sum reflected the increase in value of land bordering on the government project because of its potential use for lakeside subdivision. At this point, the witness was relying on three sales of property in the area between 1958 and 1960; the respective prices per acre were $191, $200, and $315. On the basis of these prices and the kinds of property involved, he valued the remainder at a little more than $200 per acre.

After the first hearing, the commissioners submitted a report in which they valued the entire property before taking at $98,820 and the remainder at $52,480, thus estimating the Trouts' loss at $46,-340. While they did not accept the low value placed on the remainder by the landowner and Melliff, they obviously rejected the proposition that property val-

in mind, could you now tell me and tell the commission what, in your opinion was the highest and best use of the 521.9 acres to the date of taking after the government having taken 210 acres.

A I can't answer that for this reason: I had, at the time of the Government's taking, no intent to sell any part of the remaining 500 acres, so I could put a value on it only as to what it is worth to me to keep it.

Q Is that the sole basis for your opinion that you have testified to in regard to value?

A That's right.
(R. 195).

3. Mr. Melliff valued the remainder at $26 per acre but said he was not taking into account whatever increase in land values might have been created by the demand for lakeside-subdivision property (R. 132). In fact, he made the rather startling admission that he had never appraised the remainder as a separate unit:

A I took the figures that we made in the first survey and when I was told what property was to be taken, I revamped or reworked by schedule to see what I would have left and I had 522 acres of land and I arrived at its value by putting a value on the property that was being taken, deducted that from my original appraisal of the property, which left $26 per acre on 522 acres.

Q Then, you didn't figure what the 522 acres was worth as a separate unit, then, at all. You just figured out what in your opinion, it was worth and deducted that from a previous value.

A That's right.

Q Then, would you at this time try to give this commission an opinion of what the 522 acres were worth immediately after the taking, considering it for its highest and best and most profitable use?

A I wouldn't care to answer that question without further inspection of the property up there to see what has been done. All this was theoretical that I have been talking about.
(R. 208).

ues were greatly enhanced by the Canyon Dam project. Since this first report was conclusory in nature and did not indicate why certain values were chosen, the district court resubmitted the case for further evidence and more detailed findings. A second hearing was held on December 16, 1963 at which the same expert witnesses and Mr. Trout broke down the total valuations they had given for improvements at the first hearing into individual valuations for each improvement. The commission's second report calculated appellees' loss to be $72,202. The $26,000 increase over the estimate in the first report is explained by the fact that the commissioners decided to place a greater value on the entire property before taking and a lesser value on the remaining acreage. They accepted Melliff's estimate of $112,000 for the entire property and a figure of $40,000 for the remainder. The latter sum represented the estimate of the remainder made by Nolte before he was instructed to consider special benefits attributable to the project. In its second report, the commission found that the 521 acres remaining were best suited for ranching and that the Government had failed to prove that this acreage would be suitable for lakeside subdivision. In effect, it gave no weight to the three sales between 1958 and 1960 used by Nolte to demonstrate that the remainder's value was enhanced by special benefits.

For yet a third time, the district court resubmitted the case for the purpose of taking additional evidence on the issue of enhancement. There was a hearing on December 13, 1965 at which Nolte presented recent sales of comparable property to show that subdivision development was continuing in the Canyon Dam area and that market values were still increasing. An engineer testified as to the structure and capacity of the reservoir in order to show that the location of Mr. Trout's property would be suitable for home building. As to all of the testimony presented at the third hearing, appellees objected that it should not be considered because appellant had an opportunity to present it at the previous hearings and did not do so. In March, 1966, the commission filed a brief statement which simply reaffirmed the second report; and in May, 1966, the district court entered a judgment adopting the findings of the commission. The Government appeals the award of $72,202; the Trouts, though they filed a cross-appeal, ask only that the judgment of the lower court be affirmed.

## II.

It has been settled since Bauman v. Ross, 1896, 167 U.S. 548, 574, 17 S.Ct. 966, 976, 42 L.Ed. 270, that when the remainder is "specially and directly increased in value by the public improvement," the increase in value offsets the owner's recovery for land taken. By Section 6 of the Rivers and Harbors Act of 1918, Congress gave this principle the force of statute in cases like the one before us.[4] Thus, in computing the award to the Trouts, the commission was bound to deduct the value of the remainder from the value of the entire property before taking and to include in the value of the remainder any special benefits arising from the Canyon Dam project.

Special benefits, as distinguished from general benefits which do not offset recovery, "are those which are

---

4. Section 6 of the Rivers and Harbors Act, 33 U.S.C. § 595 provides that

In all cases where private property shall be taken by the United States for the public use in connection with any improvement of rivers, harbors, canals, or waterways of the United States, and in all condemnation proceedings by the United States to acquire lands or easements for such improvements, where a part only of any such parcel, lot, or tract of land shall be taken, the jury or other tribunal awarding the just compensation or assessing the damages to the owner, whether for the value of the part taken or for any injury to the part not taken, shall take into consideration by way of reducing the amount of compensation or damages any special and direct benefits to the remainder arising from the improvement, and shall render their award or verdict accordingly.

direct and peculiar to the particular property." United States v. 2,477.79 Acres of Land, More or Less, Situate in Bell County, Texas, 5th Cir. 1958, 259 F.2d 23, 28. While the Government has requested this Court to clarify the definition of special benefits, we do not believe that this case presents an appropriate setting for an exhaustive discussion of the distinction between general and special benefits.[5] We only observe, as did this Court in the *Bell County* case, supra, that an increase in the market value of the remainder caused by its frontage on the body of water contemplated by the government project is a special benefit within the meaning of the statute.[6] The benefit signified by increased market value is a special one even though market values in the community have increased generally because of the government project. United States v. River Rouge Improvement Company, 1926, 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339; United States v. Fort Smith River Development Corporation, 8th Cir. 1965, 349 F.2d 522; United States v. Crance, 8th Cir. 1965, 341 F.2d 161. It is the distinct benefit to the remainder caused by its prospective frontage on the water that must be offset against recovery for land taken. In dealing with an analogous fact situation, the Supreme Court stated the rule we follow:

> We are of the opinion that an increase in the value of the remaining portion of any parcel of land caused by its frontage on the widened river, carrying a right of immediate access to and use of the improved stream, would constitute a special and direct benefit within the meaning of the statute, as distinguished from a benefit common to all the lands in the vicinity, although the remaining portions of other riparian parcels would be similarly benefited.

United States v. River Rouge Improvement Company, supra, at 269 U.S. 415, 46 S.Ct. 146.

In the instant case, the United States attempted to show special benefits to the Trouts' remainder by adducing sales of similar property in the vicinity. The so-called comparable sales were made between 1958 and 1960, a period of time certainly not too remote from the taking of appellees' property in 1960. As stated previously, the respective prices per acre were $191, $200, and $315. On the basis of these sales, Mr. Nolte, the Government's expert, valued the remainder at a little more than $200 per acre. He testified that he made appropriate adjustments for improvements and that he considered the properties he used for comparison very similar to the Trouts' remainder.[7] In presenting this evidence of comparable sales to prove that special benefits to the remainder nearly offset the landowners' loss of 210 acres, the Government was making as strong a case as could be expected; for the courts have said repeatedly that comparable sales—

---

5. For a thorough discussion of general and special benefits, see 3 Nichols, Eminent Domain §§ 8.6203–8.6206 (3d ed. 1965).

6. In a recent per curiam opinion, the Fifth Circuit reaffirmed the principles of the *Bell County* case. Pokladnik v. United States, 5th Cir. 1967, 378 F.2d 59.

7. To repeat, Mr. Nolte valued the entire property at $116,180 and the remainder at $113,200, estimating only a $3,000 loss. His figures for the entire tract and for the remainder included $18,200 worth of general benefits so that general benefits were not used to reduce his estimate of actual loss. His appraisal of the remainder included about $55,000 for special benefits. When asked on cross-examination for details about his valuation of the remainder, he testified as follows:

> Well, 521.9 acres, recognizing the benefits, special—and I set aside for potential subdivision property, 100 acres at $300 an acre—411.83 acres at $200 an acre, and that is three and sixty-five hundredths at $5.00 an acre, there is a road, and six and forty-two hundredths acres of flowage easements, at $100 an acre, and that totals $113,000, and there were two sheds remaining on the original 731 acres; that I valued at $200, so the value of the remaining 521 acres is $113,200.

(R. 269).

sales from a willing seller to a willing buyer of similar property in the vicinity at or about the same time—constitute the best evidence of market value. See, e. g., United States v. 60.14 Acres of Land, etc., 3d Cir. 1966, 362 F.2d 660, 665; United States v. Whitehurst, 4th Cir. 1964, 337 F.2d 765, 775; United States v. Featherston, 10th Cir. 1963, 325 F.2d 539; United States v. 5139.5 Acres of Land, etc., 4th Cir. 1952, 200 F.2d 659; Baetjer v. United States, 1st Cir. 1944, 143 F.2d 391, 397. Despite what appears from the cold record to have been a persuasive case for special benefits, however, the district court, following the commission, found the evidence of special benefits inconclusive. The commission rejected the Government's contention that the remainder would be suitable for lakeside subdivision because there was no testimony pertaining to the size and structure of the reservoir.[8]

 As an appellate court, we must review the finding that there were no special benefits under the clearly-erroneous rule. Fed.R.Civ.P. 52(a). Under this standard, however, a fact finding should be reversed "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746; see 2B Barron & Holtzoff § 1133 (Wright ed. 1961). While we do not go so far as to hold clearly erroneous the finding that there were no special benefits, we do hold that the findings before us are not explicit enough to permit affirmance. If

the best evidence of market value, i. e., evidence of comparable sales, indicates that there were special benefits to the remainder, it cannot be rejected by the district court or commission without an adequate explanation. The only subsidiary finding offered by the commission in support of its conclusion that the Government failed to prove special benefits was that there was no testimony pertaining to the capacity and structure of the reservoir.[9] We cannot accept this as a sound reason. Under the circumstances, it was unrealistic for the commission to doubt that the Canyon Dam would come into existence or that the Trouts would have waterfront property after the dam was completed. Olson v. United States, 1934, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 established the rule that an element or event affecting value must be shown to be reasonably probable and not a matter of speculation, but in this case the building of Canyon Dam was not a matter of speculation. The increasing prices of property bordering on the contemplated project make this clear. Moreover, in demanding evidence pertaining to the structure of the reservoir, the commission misconceived the issue of special benefits. The question is whether the market value of the remainder was increased by its prospective frontage on the water. Market value "is * * * a reflection of the state of mind of the public with respect to the property." United States v. Smith, 5th Cir. 1966, 355 F.2d 807, 809. If the commission felt that willing buyers would have paid more for the remainder at or about the time of taking because of the contemplated project, then an offset for special benefits would have been in order.[10]

8. As stated previously, the commission valued the remainder at $40,000. This is approximately $77 per acre.

9. The commission said in its second report that there was not even testimony to show that the reservoir "was capable of holding water" (R. 46).

10. The definition of market value illuminates the inadequacy of the landowners'

evidence. The value of land to the owner has nothing to do with market value, yet Mr. Trout's appraisal of the remainder was based on the value of the land to him. Mr. Melliff's testimony seems to add very little inasmuch as he admittedly had not appraised the remainder as a separate unit.

■ Appellees argue that the Government's evidence of comparable sales was deceiving because of variances in size, terrain, location, and improvements and therefore that the commission justifiably disregarded it. In other words, appellees argue that the three sales between 1958 and 1960 were really not comparable sales at all and did not prove special benefits to their remainder. The cross-examination of Mr. Nolte does not reveal to us any fundamental weaknesses in his testimony, and the commission did not specify any in its report. If the commission believed that the sales were not really comparable and that Mr. Nolte's testimony did not prove anything, then it should have explained why. Given some reasons for the conclusion, we would have had a basis for enlightened appellate review.[11]

In requiring the commission to give reasons for its conclusions, we do not write new law. In United States v. Merz, 1964, 376 U.S. 192, 84 S.Ct. 639, 11 L.Ed.2d 629, the Supreme Court held that a commission in a condemnation case cannot make conclusory findings on the order of a general verdict but must make detailed findings which clearly indicate its reasons for the final result:

> At the same time, there is danger that commissioners, unlike juries, may use their own expertise and not act as a deliberative body applying constitutional standards. * * * The jury is under surveillance from start to finish and subject to judicial control. Hence its general verdict that the land is worth so many dollars is not overturned for lack of particularized findings.
>
> The judge who uses commissioners, however, establishes a tribunal that may become free-wheeling, taking the law from itself, unless subject to close supervision.

* * * * * *

Conclusory findings are alone not sufficient, for the commission's findings ■ be accepted by the court "unless clearly erroneous"; and conclusory findings as made in these cases are normally not reviewable by that standard, even when the District Court reads the record, for it will have no way of knowing what path the commissioners took through the maze of conflicting evidence.

* * * * * *

We do not say that there must be an array of findings of subsidiary facts to demonstrate that the ultimate finding of value is soundly and legally based. The path followed by the commissioners in reaching the amount of the award can, however, be distinctly marked. Such a requirement is within the competence of laymen; and laymen, like judges, will give more careful consideration to the problem if they are required to state not only the end result of their inquiry, but the process by which they reached it.

376 U.S., at 197–199, 84 S.Ct., at 642–643. In the instant case, we are unable to determine the reasoning process by which the commission reached the conclusion that there were no special benefits to the remainder. If the conclusion was based solely on the absence of evidence concerning the capacity and structure of the reservoir, then it was clearly erroneous. If, on the other hand, the commission believed that the sales used by the Government for comparison were not comparable and that there was no persuasive evidence that the remainder's market value was increased by its desirability for lakeside subdivision, then the reasons for this belief should have been given.

■ In referring the case back to the district court, leave to take further

11. The commission may have believed that Mr. Nolte was not a credible witness. *Again, if it entertained such a belief, it* should have explained. If it be true that it simply had no confidence in Nolte, we are at a loss to understand why the commission accepted as the value of the remainder the appraisal he made before he was instructed to consider special benefits. There was no reason given for accepting this valuation of the remainder. In United States v. Bell, 8th Cir. 1966, 363 F.2d 94, the court reversed the commission for failure to explain why some opinions of value were accepted and others rejected.

testimony may be desirable, further instructions with respect to deductions for benefits may be needed, and specific findings should be reported.[12] If, for any proper reason, the commissioners appointed cannot or should not again serve, others may be appointed and a hearing de novo may be had. It is intended that the trial court shall have the widest possible discretion. In the event of another appeal, the parties may use, by reference, the record now before us.

For further proceedings in accordance with this opinion, the judgment is

Reversed and remanded.

12. In this kind of case, it is desirable to include in the record the complete set of instructions to the commission.