GEORGIA POWER COMPANY,
Plaintiff-Appellee,

v.

138.30 ACRES OF LAND, situate, lying and being in Land Lot 327 of the 3rd Land District 389th G. M. District, Putnam County, Georgia, Defendants,

Mildred B. SANDERS, a/k/a Mrs. Karl D. Sanders, Jr., et al., Defendants-Appellants.

GEORGIA POWER COMPANY,
Plaintiff-Appellee,

v.

377.61 ACRES OF LAND, situate, lying and being in Land Lots 367, 368, 369, 377, 378, 379, 380, 381, 382 and 383 of the Third Land District, 389th G. M. District, Putnam County, Georgia, Defendants,

Mrs. Nellie W. Larman et al., Defendants-Appellants.

GEORGIA POWER COMPANY,
Plaintiff-Appellee,

v.

532.82 ACRES OF LAND, situate, lying and being in the 145th G. M. District, Greene County, Georgia, Defendants,

Clifford H. Dyar, Jr., et al., Defendants-Appellants.

Nos. 77–1775 to 77–1777.

United States Court of Appeals, Fifth Circuit.

June 6, 1979.

George D. Lawrence, Jr., Eatonton, Ga., for defendants-appellants in all cases.

Charles H. Brown, Statesboro, Ga., for defendants-appellants in No. 77–1775.

Wallace Miller Jr., W. Warren Plowden, Jr., Macon, Ga., for plaintiff-appellee in all cases.

Kenneth L. Millwood, Bruce H. Beerman, Atlanta, Ga., for defendants-appellants in No. 77–1776.

Before MORGAN, FAY and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The owners of three properties were required to render unto the sovereign portions of their land for the Lake Wallace hydro-electric project in Georgia; they protest that they did not receive in return their constitutional due, and appeal from commission determinations of just compensation for the property taken. The owners, we conclude, were not constitutionally guaranteed a jury trial; the district court acted within the range of its discretion in appointing a commission; and the commission properly applied federal rather than state law in deter-

mining the amount of compensation. However, the commission made clear errors in, or failed adequately to explain the basis for, its conclusions determining the amount of compensation due each of the owners. Therefore, the judgments of the district court approving the reports are vacated, and the cases remanded for further proceedings consistent with this opinion.

## I. *Right to a Jury Trial.*

■ The landowners assert that their right to just compensation includes the right to have the amount of compensation fixed by a jury, and urge that the Supreme Court has never squarely denied the right to a jury trial on the issue of just compensation in an eminent domain action brought by the United States. The premises of the appellants' argument are mistaken.

In ruling on a challenge to a jury determination of the scope of a condemnation project, the Supreme Court recently said, "it has long been settled that there is no constitutional right to a jury in eminent domain proceedings." *United States v. Reynolds,* 1970, 397 U.S. 14, 18, 90 S.Ct. 803, 806, 25 L.Ed.2d 12, 17 (denial of jury trial on issue of project's scope). That case did not directly present the issue of the right to have the amount of compensation determined by a jury, but the Court's determination that no constitutional issue was presented is consistent with prior decisions in which it has implicitly held or stated in dicta that there is no right to a jury trial in condemnation proceedings. *See, e. g., Bauman v. Ross,* 1897, 167 U.S. 548, 591, 17 S.Ct. 966, 983, 42 L.Ed. 270, 289; *Long Island Water-Supply Co. v. Brooklyn,* 1897, 166 U.S. 685, 694, 17 S.Ct. 718, 722, 41 L.Ed. 1165, 1168; *United States v. Jones,* 1883, 109 U.S. 513, 519, 3 S.Ct. 346, 350, 27 L.Ed. 1015, 1017; *Curtiss v. Georgetown and Alexandria Turnpike Co.,* 1810, 10 U.S., (6 Cranch) 233, 3 L.Ed. 209. *See also* 12 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 3051 at 120 (1973); 5 Moore's Federal Practice ¶ 38.32[1] at 240–49 (2d ed. 1978). In promulgating subdivision (h) of Rule 71A of the Federal Rules of Civil Procedure, the Supreme Court also expressly approved use of a commission to determine just compensation in certain cases.

■ The Fourth Circuit has, apparently, reconsidered *Beatty v. United States,* 4 Cir. 1913, 203 F. 620, *dismissed for want of jurisdiction and cert. denied,* 1914, 232 U.S. 463, 34 S.Ct. 392, 58 L.Ed. 686, which recognized the right to a jury trial. *See United States v. 21.54 Acres of Land,* 4 Cir. 1973, 491 F.2d 301, 304; *Atlantic Seaboard Corporation v. Van Sterkenburg,* 4 Cir. 1963, 318 F.2d 455, 459; *United States v. Cunningham,* 4 Cir., 246 F.2d 330, 332. For example, in *21.54 Acres of Land, supra,* 491 F.2d at 304, the court noted that a landowner is not entitled to a jury trial if the trial judge determines that valuation should be by a commission or if Congress establishes a tribunal to determine the amount of compensation due. *See* 40 U.S.C. § 258a; Fed.R. Civ.P. 71A(h). If there were a constitutional right to a jury trial on just compensation, the judiciary and Congress would have no power to deny landowners a jury trial.

## II. *Discretion to Appoint a Commission.*

■ The landowners contend that it was an abuse of discretion for the court to appoint a commission in their cases because only a small amount of property possessing unique characteristics was involved, a jury trial would not have occasioned them hardship, and a jury would have been more sympathetic than a commission to small landowners. Yet it was precisely because the Supreme Court considered use of a commission to be more equitable to small property owners that it authorized commission appointment.

Subdivision (h) of Rule 71A of the Federal Rules of Civil Procedure gives the court discretion, "because of the character, location, or quantity of property to be condemned, or for other reasons in the interest of justice," to order the use of a commission to determine the compensation due. The advisory committee that formulated the present rule had previously proposed a rule requiring a jury trial on the issue of just

compensation in all cases except when existing statutes provided to the contrary.[1] The Supreme Court directed the committee to reconsider in view of assertions that: (1) a provision for jury trial would be unfair in the case of many small landowners who lived at distances remote from the place where court would be held; (2) such a trial would be expensive and burdensome to them; and (3) commissions are less likely than juries to make disproportionate awards when the government is condemning great acreages. *See generally* 12 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 3051; 5 Moore's Federal Practice ¶ 38.32[2].

In presenting its revised proposal, now subdivision (h), the Advisory Committee noted that the reasons justifying use of a commission for TVA cases "applied not only to the TVA but to other large governmental projects, such as . . . hydroelectric power . . . national forests, and others." Supplementary Report to the Court of the Advisory Committee, March 1951, *reprinted in* 7 Moore's Federal Practice ¶ 71A.06[2] at 71A–172. The Committee further noted that the rule as drafted met the Court's concerns: "[i]n large projects like the TVA the court may decide to use a commission." *Id.* at 71A–173.

The Lake Wallace project embraces 21,215 acres, composed of 225 tracts held by 197 different owners. The property taken is located in five counties, all of which are some distance from where the district court sits. At the time these cases were commenced, it was estimated by Georgia Power Company's land department manager that it would be necessary to file about 40 condemnation cases to acquire the property; coincidentally, 40 cases had been brought by the time this appeal was briefed. The district court noted each of these factors in denying a jury trial.

Our prior cases applying Rule 71A support the district court's decision. Although we have previously stressed that a commission is to be used only for exceptional reasons, *see United States v. Leavell & Ponder, Inc.,* 5 Cir. 1961, 286 F.2d 398, 407–08, *cert. denied,* 366 U.S. 944, 81 S.Ct. 1674, 6 L.Ed.2d 855 and *United States v. Buhler,* 5 Cir. 1958, 254 F.2d 876, 880, we have recognized that Rule 71A(h) permits denial of a jury trial and appointment of a commission in cases involving "large areas held by many small landowners, or property too distant for a jury to view the premises . . . ." *Id.* We have also upheld the use of a commission in a project involving only sixteen parcels of land. *United States v. 2,477.79 Acres of Land,* 5 Cir. 1958, 259 F.2d 23.

▮ The fact that the property of the particular landowners involved in these cases was small and possessed unique characteristics, or that the landowners desired a jury trial, is not controlling; the rule focuses on the character, location or quantity of the entire property being condemned, hence on the overall scope of the project. *See Buhler, supra,* 254 F.2d at 880. A tremendous undertaking may embrace particular tracts of small size whose appraisal is relatively easy. The commission is appointed for the entire project, not simply for specific parcels whose value is difficult to determine. If, indeed, these properties are so singular as to require complex analysis, that factor would weigh in favor of, rather than against, the appointment of a commission. *See Leavell & Ponder, supra,* 286 F.2d at 408–09; *United States v. Cunningham,* 4 Cir. 1957, 246 F.2d 330, 333.

III. *Applicability of Federal Law.*

▮ Although the constitution requires the payment of just compensation when private property is taken for a public purpose, whether the taking is by federal or state authority, different standards for determining just compensation may be established by state and federal laws. *See Grand River Dam Authority v. Grand-Hydro,* 1948, 335 U.S. 359, 69 S.Ct. 114, 93

---

1. There were statutory exceptions for TVA cases and cases arising in The District of Columbia. *See* 12 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 3051 at 119–20; 5 Moore's Federal Practice ¶ 38.22[2] at 250.1–52.

L.Ed. 64. Under federal common law, which was applied by the commission, just compensation is calculated by subtracting the project's benefit to the land retained from the value of the land taken. Under Georgia law, consequential benefits to the land retained by the condemnee are not offset against the value of the land taken in determining just compensation. Because each of the owners retained land that was benefitted by the project, if compensation had been determined under state law rather than federal law, each would have been entitled to more compensation.

■ However we have now resolved the issue by holding that federal law should be applied when a licensee of the Federal Power Commission exercises the power of eminent domain in federal court as authorized by Section 21 of the Federal Power Act, 16 U.S.C. § 814 (1970). *Georgia Power Company v. 54.20 Acres of Land*, 5 Cir. 1977, 563 F.2d 1178, *cert. denied*, 1979, —— U.S. ——, 99 S.Ct. 1213, 59 L.Ed.2d 454.

IV. *Alleged Errors in the Commission's Final Report.*

We turn, then, to the commission's report with respect to each of the properties. This necessarily involves a discussion of the characteristics of each property in some detail. However, we set forth, at the outset, the principles that apply to the reports of such commissions.

■ Commissions are not juries, whose general verdicts are favored by a presumption of regularity if substantial evidence supports their result. *See Mortensen v. United States*, 1944, 322 U.S. 369, 374, 64 S.Ct. 1037, 1040, 88 L.Ed. 1331; *Sulmeyer v. Coca Cola Company*, 5 Cir. 1975, 515 F.2d 835, 845, *cert. denied*, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341; *Boeing Company v. Shipman*, 5 Cir. en banc 1969, 411 F.2d 365, 374, 9 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2524. When a commission is used in place of a jury to determine the compensation for a taking "[c]onclusory findings are alone not sufficient," because findings by a commission are to "be accepted by the court 'unless clearly erroneous'; and conclusory findings as made in these cases are normally not reviewable by that standard." *United States v. Merz*, 1964, 376 U.S. 192, 198, 84 S.Ct. 639, 643, 11 L.Ed.2d 629, 634. "[A] hearing before a commission must result in findings much more detailed than a general verdict." *United States v. 2,872.88 Acres of Land*, 5 Cir. 1962, 310 F.2d 775, 777, *modified* in *Merz, supra*. *See Cunningham, supra*, 246 F.2d at 333. The path followed by the commission in reaching the amount of the award shall be distinctly marked, *United States v. Merz, supra*, 376 U.S. at 199, 84 S.Ct. at 643, 11 L.Ed.2d at 634, if not blazed with an array of findings of subsidiary facts that demonstrate that the ultimate finding is soundly and legally based. *2,872.88 Acres of Land, supra*, 310 F.2d at 779.

We recently reversed the decision of a district court accepting a commission's report that failed to explain why the commission had rejected certain sales as comparables; the case was remanded for findings that would give us "a basis for enlightened appellate review." *United States v. Trout*, 5 Cir. 1967, 386 F.2d 216, 224. While the commission's path in these cases may have been better marked than the trail in *Trout*, certain of its findings were, nevertheless, either clearly erroneous or insufficient to provide a basis for "enlightened" review. Therefore we remand the cases for further proceedings related to some of the points discussed below.

*Sanders Taking*

■ After the taking of 138.30 acres by Georgia Power Co., the landowners are left with three separate parcels consisting of 4.79, 21.20 and 41.03 acres. The smallest parcel has direct highway access, but the other two do not. The 21.20 acre parcel has been cut off from the state highway by the reservoir; after the taking, the only remaining access to this parcel is over a small, unpaved road that grazes the eastern corner of the property. In order partially to remedy this problem, Georgia Power Co., prior to the commission's hearing, gratuitously granted to the landowners an unim-

proved 80-foot easement that allows direct access to a county road. By its terms, however, the easement expires "upon non-use for 24 consecutive months, or no maintenance for 12 months . . . ."

The 41.03 acre parcel was deprived of access to a state highway by the taking of 10 acres in the western corner of the original tract. The district court's final order reserves to the landowners, "a 50-foot, non-exclusive road right-of-way" along the southwestern boundary of the 10 acres taken, which will give this parcel access to the highway. However the topography of the area makes it difficult to construct a road, and drainage from an adjoining tract may create maintenance problems. International Paper Company owns the fee simple interest over which the easement runs;[2] if a road is constructed, the users must maintain it or they must bear the expense of constructing a paved surface. Even in that event, the county may refuse to accept dedication because the road is on property owned in fee by International Paper Company.

In its amended report, the commission found that the provision made for road purposes with respect to the 21.20 acre tract was "so nearly adequate" as not to affect adversely the fair market value of the tract. It found that giving the 41.03 acre tract a value of $1100 per acre "includes the cost of any road." The commission allowed no additional compensation for the construction of a road to this tract because "[n]one of the comparables cited by the witnesses for the landowner or the Power Company included an item for road construction." In reaching these conclusions, the commission did not adequately compensate the owners for the access problems created for these two parcels, and, therefore its findings as to their values are clearly erroneous.

▆▆▆▆ A simple easement over unimproved fields that will expire "upon no use

for 24 consecutive months, or no maintenance for 12 months," is clearly less valuable to the property owned than either a public road or a permanent easement. If the owner is unable for any reason to build a road over the easement within 24 months, or if, thereafter, the owner is unable to maintain it, it will be lost.[3] Moreover, even if the easement is utilized, the landowner must bear both the cost of construction and the continuing expense of maintenance. Each of the expert witnesses who testified concerning the value of the remaining 21.20 acre tract believed that the limited easement added to the value of the property and based his estimate of value on what the property would be worth if a road were constructed. Two of them calculated the current value of the parcel by estimating the value of the tract with road access, then deducting the cost of constructing a road and an additional amount to account for the risk of losing the easement. One estimated that the value of the tract should be reduced by 25 percent simply to account for the limited nature of the easement; another, a witness for Georgia Power, made a 20 percent reduction for the same reason. A third expert, who did not specifically make a deduction to account for the limited nature of the easement, nevertheless admitted that such an easement is less valuable than a permanent one. The commission relied on these experts' other opinions in connection with this parcel, but ignored their testimony concerning the effect of the limited easement. Because all of the experts agreed that the restricted nature of the easement had a detrimental effect on value, and two of the three expressly stated that some allowance should be made for it, the failure of the commission to do so was clearly erroneous.

The commission assumed that the cost of building a road over the right-of-way af-

**2.** Georgia Power Co. obtained from International Paper Co. the easement that was granted to Sanders.

**3.** International Paper Co. has explained, in a letter to Georgia Power Co., that the intent of the parties to the easement was that the 24 month and 12 month limitation periods shall commence when filling of the Wallace Dam Reservoir begins, or, at the latest, on the scheduled filling date of January 1, 1979.

fected the value of the 41.03 acre parcel, but in allowing only $1100 an acre for the property with some vague allowance for this expense, it included far less than the estimated $10,000 cost of a paved road. If the commission assumed that a less expensive road would be built that could not be dedicated to the county, it made no specific allowance for maintenance expense, and the language of its report suggests that none was tacitly included. Its failure to take adequately into account the effect of these costs on the parcel's value was clearly erroneous.

### Larman Taking

The Larman taking was on October 29, 1974. Sales of other properties prior to that date were used by the commission as comparables for the purpose of estimating the value of the Larman property; some of these comparables were used to estimate its pre-taking value, while the others were used to estimate its post-taking value. The use of different comparables apparently was based on the assumption that the character of the property was changed by the taking and, therefore, other comparables then became appropriate. The prices of these comparable properties were adjusted to account for the amount of time that had elapsed between the time of sale and the time of the Larman taking, and the market conditions prevailing during this period. Mrs. Larman alleges that the commission was inconsistent in its adjustments and that, had it followed its own standards, it would have awarded her more compensation. In particular, she asserts that the commission improperly failed to adjust for inflation one of the comparable sales used to establish the value of the Larman property before the taking while it made such adjustments in assessing other comparable sales that had occurred about the same time and that were used to establish pre- and post-taking values.

One expert witness testified that property in the area of the Larman property appreciated about 25 percent during 1973, but that, beginning in 1974, the market leveled off. This expert thought that the appreciation rate was a little higher, approximately 35 percent, during 1973 for property that would remain after the project was completed or that was purchased because of speculation prompted by the project. This testimony clearly supports the commission's adjustment of several of the comparable sales that occurred more than two months prior to the end of 1973.

The following table shows the increases that the commission made in the sale price per acre of the comparable sales to account for the inflation after they occurred:

| Date of sale | Sale used as comparable for determining value before or after taking | Sale price (per acre) | Commission's adjustment (price/acre) | Percentage adjustment |
|---|---|---|---|---|
| 1/73 | Before | $550 | 0 | 0 |
| 2/73 | After | $825 | +$288 | 34.9% |
| 3/73 | After | $974 | +$87 | 8.9% |
| 6/73 | Before | $365 | +$86 | 23.6% |
| * 11/73 or post 1973 | Used for both purposes | Varied | 0 | 0 |

* Remaining sales

We have great difficulty in comprehending what the commission did and why. For example, in establishing the value of the property before the taking, an adjustment was made in the June 1973 sale, but none in the January 1973 sale. The

reason for this apparent inconsistency is not explained. In effect, the commission apparently assumed, without adequate explanation of its rationale, that without the project the value of the property sold in January would have been unchanged from that time through October 1974. Yet an expert who testified regarding the inflation rate during 1973 stated that he would add 25 percent to the sale price of that property to adjust for inflation since the time it was sold. The failure either to make such an adjustment or to account adequately for the failure to do so makes the report unacceptable.

When we examine the comparables used to value the residual property after the taking, we find other unexplained adjustments or failures to adjust. The March sale was adjusted upward less than 10 percent for timing. The sale price of the comparable property sold a month before was adjusted upward by almost 35 percent, which is more in line with what the expert testimony indicated is appropriate. At least on the surface, the handling of the March 1973 comparable appears to be an error in Mrs. Larman's favor, for it appears that a greater upward adjustment in the sale price of this property should have been made.

## Dyar Taking

### A. *Shallow water*

█ Once the reservoir is filled, the property retained by the landowners will have an extensive shoreline. The water in this part of the lake will be extremely shallow. Moreover, the level of the water in the lake will rise and fall daily because Lake Wallace will be a pump-storage facility. This variation in the water's depth, coupled with the shallowness of the reservoir in the area of Dyar's property, will cause a substantial daily movement of its shoreline. In the southern portion, it will move in and out up to 200 feet horizontally each day; consequently, vast mudflats will often be exposed.

Expert witnesses for both parties testified that the portion of the Dyar property with shallow water will be less valuable than the portion with deeper water. One witness estimated that the value of this property will be one-third less than if it had deeper water. The commission, however, made no specific allowance for this factor. It explained its failure to do so on the basis that it relied exclusively "on adjusted comparables sales."

In valuing the property retained after the taking, the commission cited the conclusions of the experts who testified, but did not itself adjust the sales these experts cited as being comparable. All of these experts clearly took the shallow water into account in their testimony. For purposes of comparison with the retained Dyar property, two of them adjusted downward the sales prices of those properties they considered comparable having water depth superior to that of the Dyar property. In addition, they included a comparable property that has even shallower water than the Dyar property will have, and adjusted its sale price upward to account for this factor. Based on his analysis of the adjusted comparables he had selected, one of these two experts concluded that the remaining Dyar property was worth $900 per acre. The other concluded that it was worth $850 per acre. The third expert, who testified for the landowners, neither considered any sales involving property with water shallower than that on the Dyar property, nor adjusted each comparable separately for this factor; in order to take it into account, however, he reduced by one-third the estimated value he obtained based on the comparables he considered. He also included a discount factor for "holding time" until the lake is ready for use. The commission considered this to be improper, and, therefore revised his figure of $668 per acre to $813 per acre.

The commission concluded that the remaining Dyar property is worth $850 per acre, which is less than or equal to the value given by two of the experts even after taking the shallow water into account. The commission would have arrived at a higher value for the property than it did if it had not accepted the adjustments these experts

made to take into account the shallow water. Its reliance on the testimony of the experts regarding the influence of this factor, rather than attempting to make its own specific adjustments to each comparable sale to take it into account, was not clearly erroneous.

### B. Sales the commission rejected as comparable

The commission rejected three sales that the landowners' expert testified involved property comparable to the Dyar property. The owners assert that the commission did not adequately explain its basis for rejecting these sales.

■ The Dyar tract was a functioning farm unit. This gave it a higher value than unused fields. Only one of the sales accepted as comparable by the commission involved property employed as a functioning farm unit; yet, each of the properties involved in the three sales that the commission rejected as comparables was so utilized. The commission rejected one of them because it was an "industrial sale"; the property had been sold to a company for development of a fertilizer processing plant. The other two sales the commission refused to consider were dismissed with the conclusory statement that they "were not of sufficient comparability to use."

■ The commission's refusal to consider the "industrial sale" was reasonable. However, no basis for its refusal to treat the other two sales as comparable is shown in the record. In fact, when the landowners' expert testified regarding these two sales, the commission indicated that it would view them as comparables.

These two sales were at prices of $750 per acre and $733 per acre, considerably higher than the prices of the other properties considered by the commission. Had these sales been considered, Dyar's compensation would have been greater. The commission's failure to adequately explain its refusal to consider these sales as comparables makes its report unacceptable.

### C. Adjustment for pasture

Before the taking, the Dyar property consisted, in part, of open land or pasture land and, in part, of timber land. The commission considered sales of different properties in order to value each of these components of the Dyar property. In order to value the open land or pasture land, the commission considered sales of three properties that it considered comparable. The prices of each of these properties was adjusted to take into account differences between it and the Dyar property. With the adjustments made by the commission, the prices of these comparables were $459, $468 and $500; based on this evidence, the commission valued the Dyar pasture land at $485 per acre.

■ The owners assert that a 10 percent downward adjustment made by the commission to account for "pasture" in the price of one of the comparables, a sale by Barksdale to Beauchamp, is clearly erroneous. The commission gave no justification for this adjustment. The reason for it is not self-evident, although the record suggests at least one possible explanation.[4] We are unable, however, to determine from the record what the commission's rationale actually was. The landowner was entitled to an explanation that would permit us intelligently to review it. See United States v. Trout, supra. Further findings should have been made by the commission.

### Conclusion

For the reasons set forth above, further fact-findings and, in light thereof, reevaluation of the compensation awarded each of these landowners are required. Accordingly, the judgments of the district court in these cases are VACATED, and the cases

4. One of the experts who testified regarding the Barksdale sale testified that he believed this was a speculative sale. The commission may well have believed that the sale price was somewhat more than a buyer would pay simply for land to use for pasture. The 10 percent reduction in this sale price, therefore, may be attributable to the commission's taking this factor into account.

are REMANDED for further proceedings consistent with this opinion.

VACATED and REMANDED.